# IN THE UNITED STATES DISTRICT COURT
# FOR THE NORTHERN DISTRICT OF GEORGIA
# ATLANTA DIVISION

| | | |
|---|---|---|
| TERI CALLEN | ) | |
| | ) | |
| on behalf of | ) | |
| herself and all others similarly | ) | **CLASS ACTION COMPLAINT** |
| situated, | ) | |
| | ) | |
| | ) | CASE NO: _____ |
| *Plaintiff,* | ) | |
| | ) | |
| v. | ) | |
| | ) | |
| DAIMLER AG and MERCEDES | ) | |
| BENZ USA, LLC | ) | |
| | ) | |
| | ) | Jury Trial Demanded |
| *Defendants*. | ) | |

## INTRODUCTION

1.     Plaintiff Teri Callen, f/k/a Teri Kimball-Callen Stomski, ("Plaintiff") brings this putative Class members action complaint against Defendants Daimler AG and Mercedes Benz USA, LLC.

2.     Plaintiff brings this action individually and on behalf of all others similarly situated and allege upon personal knowledge, information, and belief that Defendants Daimler AG ("Daimler") and Mercedes Benz USA, LLC ("MBUSA" and collectively "Mercedes" or "Defendants") are liable to them and the proposed

1

Class under federal and state law for defective materials, workmanship, engineering, manufacturing, development, design, marketing, and sale of vehicles with defective interior wood trim.

3.    The vehicles at issue in this litigation include, but may not be limited to, the W212 Mercedes E Series (years 2009 to 2016) equipped with Mercedes' Burl Walnut Wood Trim ("Class Vehicles).[1]

4.    This action is brought to remedy violations of law in connection with Defendants' materials, workmanship, engineering, manufacturing, development, design, marketing, advertising, selling, warranting, and servicing of the Class Vehicles.  The Class Vehicles were all equipped by Mercedes with its Burl Walnut Wood Trim, which has a serious latent defect that causes the trim to substantially fade, grow discolored, and become cloudy over time, with wild variations in where and when the areas of the trim deteriorate, leaving certain areas unaffected and other areas dramatically affected within the same vehicle. Notably, Mercedes cars and SUV's of similar ages to Plaintiff's vehicle, and which utilized other available trims are not known to have similar issues.

## Mercedes' Knowledge of the Defect and Attempt to Hide It

---

[1] Discovery will enable Plaintiff to more precisely determine which model-years share the same uniform (and uniformly defective) wood trim, but upon information and belief, this list includes all affected models and model years.

5.      Mercedes knew, prior to Plaintiff's purchase, and in fact before any purchase of the Class Vehicles by any Class member that purchased a Class Vehicle after the spring of 2009, that the Burl Walnut Wood Trim itself was defective and that its installation of the defective trim would lead to the problems Plaintiff and Class members are experiencing.  However, instead of proactively fixing the known issue, Mercedes actually decided to instruct its dealers to attempt to hide the defect.

6.      Specifically, a "Wood Trim Fading or Discoloring Technical Service Bulletin" (LI68.10-P-050) was issued by Mercedes as far back as November 22, 2010, and that bulletin specifically identified the issue (the "First TSB").  The second version of of that First TSB is attached as Exhibit A.[2]  The First TSB noted that "[f]adding or discoloration of the burl walnut trim may develop.  The most common affected areas are either behind the SRS label (Fig. 1 – passenger side instrument panel) or on the front doors when removing the interior shipping protections material.  Other areas may also be affected."  Ex. A, p. 1.  A visual example of an affected area was provided:

---

[2] Plaintiff is unable to locate the first version of that TSB, but it would have been issued before November 22, 2010.

Fading or discoloration of the burl walnut trim may develop. The most common affected areas are either behind the SRS label (**Fig. 1** - passenger side instrument panel) or on the front doors when removing the interior shipping protection material. Other areas may also be affected.

**ATTACHMENTS**



**Fig. 1: Example Of A Faded Area Behind Removed SRS Label**

Ex. A, p. 1.

7.      The cause of the defect is indicated as "Inadequate UV (ultra violet) ray protection." *Id.* The remedy indicated in the First TSB is to "[r]eplace all wood trim panels with parts kit number as per SI68.30-P-0003A." *Id.*

8.      The First TSB claimed that the Class Vehicles included "Model W212/S212 Affected VIN range: A000988 to A291888 with burl walnut wood trim (sales code 731)."

9.      Rather than fixing the issue in all of the Class Vehicles, Mercedes decided to instruct dealers to take measures to hide the defect.

10.      Mercedes instructed dealers that, "[f]or vehicles within dealer inventory, it is advisable to inspect these vehicles for fading or discoloration. *If*

4

***fading or discoloration is not present then relocate the SRS label to an area on the instrument panel / lower control panel (Fig. 2) and remove any interior transportation protection material from the wood surfaces, such as used on the doors.*** Mercedes provided a visual example of where the dealer should put the SRS label:



**Fig. 2: Example of SRS Label Location**

11.    In other words, Mercedes told dealers to check for the fading/discoloration, and if it was not currently visible, Mercedes instructed the

dealers to move the stickers so that future fading was not noticeable (the covered area not being subject to any light that contributed to the fading).  Apparently, Mercedes believed that if a sticker was not covering part of an area of the trim that was otherwise fading, the fading, though still present, would not be noticeable until long after the customer drove off the lot in their new car.

12.    Three years after issuance of the First TSB, Mercedes issued yet another technical service bulletin covering the defect.  That bulletin, titled "Fading of Wood Trim in Model Series 212 Technical Service Bulletin" (LI68.30-P-053962) was issued on August 18, 2015 (the "Second TSB").  Version 4 of that Second TSB[3] is attached as Exhibit B.  Similar to the First TSB, the Second TSB acknowledged "[f]ading of the burled walnut veneer wood finish trim parts," and it noted that the defect was that "UV radiation can cause fading in some cases."  Ex. B, p. 1.  The remedy was to replace the affected Burl Walnut Wood Trim with "parts kit of burred walnut veneer wood finish trim . . . from the GLC."  *Id.*  Upon information and belief, many versions of the Second TSB were issued, with up to nine (9) versions known to Plaintiff (Version 9 was issued on August 18, 2015, and is attached as Exhibit C).

---

[3] Plaintiff has been unable to locate versions 1 through 3 of this TSB.

13.    Unlike the First TSB, which attempted to limit the defective vehicles to those with VIN range: A000988 to A291888, the Second TSB claimed that the Class Vehicles included "MODEL 212 with CODE (731) Burred walnut veneer wood finish trim" and "MODEL 212 with CODE (W 60) Burred walnut veneer designo wood trim, brown." *See* Ex. B, p. 1; Ex. C, p. 1.  In other words, the Second TSB acknowledged that the entire W212 E Series lineup (2010 to 2016) was affected. *See* Ex. B and Ex. C.

14.    Although the visual aspect of these defect manifested itself over time, Mercedes knew of the defect well prior to the sale of the Class Vehicles, and provably knew about the issue at least as early as the first year of production of the W212 E Series car (2010); yet Mercedes continued to put the latently defective Class Vehicles on the market.   Based on public information, it appears that Mercedes sold almost 500,000 E series vehicles between 2010 and 2016 in the United States.  Upon information and belief, a large majority of those vehicles were Class Vehicles (those with Burl Walnut Wood Trim).

15.    Mercedes breached their express and implied warranties by continuing to sell the defective Class Vehicles and refusing to remedy the issues; instead, actively concealing them from Plaintiff and the putative Class members.

16.    Mercedes also was unjustly enriched at Plaintiff's expense and fraudulently suppressed their knowledge of the issues with the Burl Walnut Wood Trim on the Class Vehicles in violation of various state consumer protection laws.

## PARTIES

17.    Plaintiff Teri Callen, f/k/a Teri Kimball-Callen Stomski is an adult resident and citizen of South Carolina.   When she purchased the Class Vehicle at issue, she was an adult resident and citizen of North Carolina.

18.    Defendant MBUSA is a Delaware corporation with its principal place of business in Atlanta, Georgia.

19.    MBUSA is a wholly owned subsidiary of Daimler.

20.    At all times relevant herein, MBUSA has been and has acted as an agent of Daimler and was and is subject to Daimler's control.

21.    Defendant Daimler is a German corporation with its principal place of business in Stuttgart, Germany.

22.    Mercedes engineered, manufactured, developed, designed, marketed, distributed, sold, leased, and warranted the Class Vehicles.   Mercedes also developed and disseminated the manuals, warranty booklets, advertisements, and promotional materials relating to the vehicles.

23.    At all times relevant herein, Daimler (itself and through its related entities) engaged in the business of engineering, designing, developing, and manufacturing the Class Vehicles.

24.    Upon information and belief, Daimler was responsible for materials, workmanship, engineering, manufacturing, development, and design the Class Vehicles, including their defective interior surfaces, and therefore is an essential party to this action concerning a defect in the Class Vehicles' interior wood trim.

25.    Upon information and belief, Daimler has, and at all relevant times had, the contractual right to exercise, and in practice has exercised, control over MBUSA's work, including but not limited to the materials, workmanship, engineering, manufacturing, development, and design of Class Vehicles, the manner of Class Vehicles' marketing and advertisement, the scope of written warranties, the scope of repairs in practice to be covered under warranty, and representations made and facts withheld from consumers and the public about the trim defect.

26.    Daimler has been directly involved in assisting, directing, and controlling MBUSA, and MBUSA's authorized dealers' handling of Class Member complaints regarding the Burl Walnut Wood Trim defect.

27.    Daimler has held MBUSA out as its agent for all purposes in the United States, but especially for sales and marketing of Class Vehicles and for ongoing management of relationships with purchasers and lessees of Class Vehicles.

28.    Daimler established MBUSA as its wholly-owned subsidiary company. It named MBUSA with its official "Mercedes-Benz" title. It provided MBUSA with marketing and technical materials avoiding any distinction between MBUSA and Daimler, and instead representing MBUSA as nothing less than Daimler's presence in the United States for purposes of selling and leasing "Mercedes-Benz" brand vehicles and providing related services.

29.    Based on the foregoing actions, representations, and omissions, MBUSA's representations regarding the Class Vehicles that were the responsibility of Daimler in, for example, Daimler's materials, workmanship, engineering, manufacturing, development, and design of the Class Vehicles, and were injured because of their purchase or lease of defective Class Vehicles.

## **JURISDICTION AND VENUE**

30.    This Court has jurisdiction over this action pursuant to the Class Action Fairness Act ("CAFA"), 28 U.S.C. § 1332(d), because at least one class member is of diverse citizenship from one defendant, there are more than 100 Class members,

and the aggregate amount in controversy exceeds $5 million, exclusive of interest and costs.

31.    This Court also has federal question jurisdiction over this action under 28 U.S.C. § 1331 because this case includes claims arising under federal law.

32.    This Court has supplemental jurisdiction over the remaining claims pursuant to 28 U.S.C. §1367(a).

33.    This Court has personal jurisdiction over MBUSA because MBUSA is authorized to do business in this District, conducts substantial business in the District, has its principal place of business in the District, is at home in the District, and some of the actions giving rise to the complaint took place in the District. Each of these facts independently, but also all of these facts together, are sufficient to render the exercise of jurisdiction by this Court over MBUSA permissible under traditional notions of fair play and substantial justice.

34.    This Court also has personal jurisdiction over MBUSA under 18 U.S.C. § 1965 because MBUSA is found in, has an agent in, or transacts business in this District.

35.    This Court has personal jurisdiction over Daimler because Daimler has continuous and systematic general business contacts in this District.

36.    By headquartering its wholly owned subsidiary MBUSA in this District, and using MBUSA as its channel for marketing, distributing, warranting, selling and leasing the Daimler-engineered, manufactured, developed, and designed Class Vehicles in the District and the United States, Daimler itself has deliberately taken affirmative steps to make Daimler-engineered, manufactured, developed, and designed vehicles available to consumers in the District and the rest of Georgia, including Plaintiff and Class members; created continuing obligations between Daimler and residents of the District; and purposefully availed itself of the benefits and protections of conducting business in the District.

37.    Daimler employees and representatives regularly visit MBUSA, thereby continuously conducting business in this District.

38.    Further, Daimler's wholly owned subsidiary MBUSA is at home in this District, and MBUSA's contacts in this District can be attributed to Daimler.

39.    Further, MBUSA is an agent of Daimler's, which such contacts by MBUSA being imputable to Daimler.

40.    Venue is proper in this District under 28 U.S.C. § 1391(b) because Defendants, as corporations, are deemed to reside in any judicial district in which they are subject to personal jurisdiction.

41.    Additionally, Defendants transact business within the District, MBUSA has its principal place of business in this District, and some of the events establishing the claims occurred in this District.

## FACTS

### A.    Callen's Facts

42.    In December of 2014, Callen purchased a 2014 Mercedes E350 Sedan, Vehicle Identification No. WDDHF5KB4EA974665, with Burl Walnut Wood Trim from an authorized Mercedes-Benz dealership in Charlotte, North Carolina (Hendrick).

43.    At the time Callen purchased her vehicle, it had 11,094 miles and came with a Mercedes Certified Pre-Owned (CPO) warranty and the remaining life of the standard Mercedes warranty.  Callen's vehicle is still under the warranty and within the warranty period, and the warranty is from the Defendants and Defendants have an obligation to correct the trim defect under it.

44.    One of the main and important reasons for Callen selecting her Class Vehicle was the fit and finish of the interior, which Mercedes touted extensively to her as superior, exclusive, and high quality.

45.    Prior to her purchase, Callen saw Mercedes's newspaper, magazine, social media, and television ads touting that the Class Vehicles both new, certified

pre-owned, and used were reliable, endurable, of good finish, of high fit, and exceptional quality.  Plaintiff relied on Defendants' representations in making her purchase.

46.    Upon information and belief, the warranty Callen received is the same as the one all Class members received, whether they purchased their vehicle directly through Mercedes or through a subsequent used-car retailer.

47.    Callen's Class Vehicle had not been wrecked nor has the interior been modified or refinished – it has the original Burl Walnut Wood Trim interior.

48.    Callen purchased her Class Vehicle for her personal, family, and household use and on most days and nights stores it safely and purposefully either outside her home or inside her garage.  Her Class Vehicle was not exposed to any airborne or environmental influences which would have adversely affected its interior.  Notably, other Mercedes E Series vehicles of similar mileage which do not include the Burl Walnut Wood Trim interior from the factory do not have the identified issues with fading, cloudiness, or discoloration.

49.    Callen expected her Class Vehicle to be of good and merchantable quality, materials, and workmanship and not defective.  She had no reason to know, or expect, that the interior of her Class Vehicle was defective.  Had she known these facts, she would not have bought her Class Vehicle or would have paid less for it.

50.     Defendants also represented that the Class Vehicles would be repaired or replaced to correct defects in material and workmanship at the time of purchase or lease in at least the applicable warranties applying to her vehicle. Callen specifically relied on those representations in her decision to purchase the vehicle.

51.     Callen had suspected that there was some fading and cloudiness to the Burl Walnut Wood Trim on the passenger side of the vehicle when she was driving as a passenger in her vehicle sometime in September of 2017.  However, Callen first noticed that there was indisputable fading with the Burl Walnut Wood Trim on her Class Vehicle in November of 2018 when an acquaintance that is a mechanic noticed the issue and drew her attention to it.  After her attention was drawn to the issue, she examined the trim on each door, center console, and on and around the dashboard and realized that those areas no longer matched each other, were faded, discolored, and had a cloudy appearance.

52.     The Burl Walnut Wood Trim continued to deteriorate and in March of 2018, when it was obvious that there was a systemic problem with her interior trim, Callen called her authorized Mercedes-Benz dealership in Columbia, South Carolina (Dyer), and requested an appointment to have her faded Burl Walnut Wood Trim fixed, along with another unrelated issue.

15

53.    The Mercedes dealership's service department manager acknowledged that there was an issue with the Burl Walnut Wood Trim interior but declined to help in any way and indicated that the CPO warranty does not cover anything that is trim related.

54.    By this time, Callen had heard that at least the First TSB had issued, but the dealership indicated that TSBs did not have any bearing on whether an issue is covered under warranty.

55.    Mercedes personnel at the dealership did acknowledge that the Burl Walnut Wood Trim was defective and that they were aware of multiple other W212 E-Series vehicles having the same problem.  Yet, Callen's warranty claim was denied, and Defendants failed to make the repair when reported and refused and failed to adequately repair or cover the defect under the warranty.

56.    Estimated costs to replace/repair the Burl Walnut Wood Trim is between $3,000 and $5,000 dollars, and the replacement of the original interior would substantially depreciate the value of the vehicle.

57.    The same defective Burl Walnut Wood Trim was installed in all Class Vehicles.

58.    Ultimately, Mercedes has refused to repair or replace the interior wood trim interior of Callen's vehicle, despite acknowledging the common Burl Walnut

Wood Trim defect by the service department manager and the First and Second TSBs.

59.    Although it is difficult to see the extent of the defect via pictures, the following pictures show Callen's Burl Wood Trim Interior today and the obvious defects:











19

60.    Callen's vehicle is just one of hundreds of thousands of Class Vehicles that suffer from an irreparable defect in the interior trim that results in fading, discoloration, and clouding of the Burl Walnut Wood Trim interior.

**B.    General Facts**

61.    Each Class Vehicle is a luxury vehicle that comes with a relatively high price tag in exchange for a vehicle that is superior to others in looks, drivability, fit, and finish.  Plaintiff and the putative Class members sought out the Class Vehicles and purchased the Class Vehicles intentionally after seeing and relying on Mercedes ads.  The choice of Mercedes with the Burl Walnut Wood Trim interior was no mistake—when the Burl Walnut Wood Trim is in the condition in which it is sold and should remain, it has a particularly unique interior fit and finish that gives the cars a luxurious look that other interiors do not replicate.  Indeed, the Burl Walnut Wood Trim is the most common interior used in Mercedes brand vehicles, and it is the trim that is the most associated with the Mercedes brand—it is central to the Mercedes brand.

62.    The condition of the interior trim on the Class Vehicles is an important aspect of their overall value, is considered by first purchasers as well as secondary purchasers, and it often determines whether a car will sell at fair market value or not.

63.    The defects in the Burl Walnut Wood Trim have affected the resale and value of the Class Vehicles.  Defendants recognize this as they advertise the quality of their interior finishes and offer lower values for cars with interior and trim problems such as those on the Class Vehicles. This is proven by the fact that Defendants seriously discount their offers for any buybacks or secondary purchases of Class Vehicles showing fading, discoloration, and cloudiness in the trim interior.

64.    The defects in the Burl Walnut Wood Trim likely stems from one of two sources: 1) a defect in the Burl Walnut Wood Trim itself and its UV resilience or 2) a defect in the application of the UV protectant to the Burl Walnut Wood Trim. This is supported by the indication in the First and Second TSBs that the source of the defect relates to inadequate "UV" (ultra violet) ray/radiation protection

65.    Defendants knew that prior to marketing and selling the Class Vehicles to Plaintiff and the putative Class members that the Burl Walnut Wood Trim interior was unable to withstand normal exposure to UV radiation but continued to sell the Class Vehicles with the hope that Class members would not notice, or would not notice within any applicable warranty period, the fading, discoloration, and cloudiness that develops in the Burl Walnut Wood Trim interior..

66.    Notwithstanding this long-standing problem and extensive knowledge of the issue prior to Plaintiff's purchase, Defendants continued to advertise and sell

21

the defective vehicles and failed to issue an appropriate recall.    Defendants knowingly failed to provide truthful public information about the defects present in the Burl Walnut Wood Trim interior.

67.    Indeed, as indicated in the First TSB, Mercedes not only continued to sell the Class Vehicles, it actually instructed its dealers to conceal the defect by ensuring that nothing was covering the Burl Walnut Wood Trim (e.g., the SRS label) so that, when that covering (e.g., sticker) was removed, the fading, discoloration, and cloudiness in the surrounding areas would not be apparent to a potential customer.

68.    Defendants benefitted from each of Plaintiff's and the putative Class members' purchases of their Class Vehicles.  For Plaintiff and those putative Class members who purchased new or CPO vehicles, Defendants received revenue from the sale.

69.    For Plaintiff and those putative Class members who purchases certified pre-owned vehicles, Defendants received revenue from the sale of the extended warranties on those Class Vehicles.  Defendants also received a benefit from the sale of these certified pre-owned cars because it increased the used market prices, thereby allowing Defendants to charge more at the outset.

70.     Finally, Plaintiff and Class members who purchased their Class Vehicles used further bestowed a benefit upon Defendants because it increased the used market resale statistics and value, thereby allowing Defendants to charge more at the outset for their new vehicle sales.

71.     For each Class Vehicle, Defendants issued an express warranty which covered the vehicle, including but not limited to, the Burl Walnut Wood Interior Trim, warranting it to be free of defects in materials and workmanship at the time of purchase or lease.

72.     This warranty was a material factor in Plaintiff's and Class members decisions to purchase Class Vehicles.

73.     Pursuant to their express and written warranties, Defendants warranted the Class Vehicles, including the interior surfaces, to be free of defects in materials, workmanship, engineering, design, manufacturing, development, and warranted that repairs or replacements necessary to correct defects in material or workmanship arising during the first 48 months or 50,000 miles, whichever came first, would be made by authorized dealers, without charge.

74.     Defendants similarly expressly and in writing warrantied Certified Pre-Owned Class Vehicles, such as that which Callen owns, warrantying that the Class Vehicles,  including the interior surfaces, to be free of defects in materials,

workmanship, engineering, manufacturing, development, and design and warranted that repairs or replacements necessary to correct defects in material or workmanship arising five years subsequent to the expiration of the regular factory warranty would be made by authorized dealers, without charge.

75.    Defendants also sold or leased the Class Vehicles under implied warranties of merchantability. Defendants impliedly warranted the Class Vehicles to be merchantable, fit for the ordinary purposes for which they were intended to be used, including the guarantee that they were in a non-defective condition for use by their owners or lessees for the ordinary purpose for which they were intended and were not otherwise injurious. Defendants are under a duty to engineer, manufacture, develop, design, construct, manufacture, inspect, and test the Class Vehicles to make them suitable for the ordinary purposes of their use.

76.    Defendants breached their warranties for the Class Vehicles because of the latent defect with the Burl Walnut Wood Trim interior. Despite acknowledging the defect, and even attempting to conceal and hide it, Defendants breached their warranties by failing to repair the interior as warranted, and otherwise continuing to use the defective Burl Walnut Wood Trim interior on its vehicles.

77.    In breach of Defendants' warranties, the Class Vehicles are defective, unfit for the ordinary purposes for which they are intended to be used, and not merchantable.

### Mercedes's Marketing and Concealment

78.    Mercedes knowingly manufactured and sold the Class Vehicles with the Burl Walnut Wood Trim defect, while willfully concealing the true inferior quality and sub-standard performance of the Class Vehicles' interior trim. That is demonstrated by the First TSB, issued in 2010, and is further shown by the Second TSB, issued five years later in 2015.

79.    Mercedes directly markets the Class Vehicles to consumers via extensive nationwide, multimedia advertising campaigns on television, the Internet, billboards, print publications, mailings, and through other mass media.

80.    Mercedes's marketing material describes the various Class Vehicles as "state-of-the-art," "luxury," "fine craftsmanship," and "the most advanced vehicles on the road." Mercedes slogan for its vehicles is "the best or nothing."

81.    Although Mercedes knew of the Burl Walnut Wood Trim interior's propensity to fade, discolor, and become cloudy on Class Vehicles, it failed to notify Plaintiff and Class members of this prior to their purchase of the vehicle.

82.     Instead, Mercedes informed consumers that "[d]efects in paint, trim or other appearance items are normally taken care of during our new vehicle preparation or by the authorized Mercedes-Benz Center during new vehicle inspection." Yet at the same time, it was instructing dealers on how to hide the latent defect in the Burl Walnut Wood Trim interior by removing stickers from the trim to ensure any fading, discoloration, and clouding of the trim was not noticeable until after the Class Vehicle was driven off the lot.

83.     When Plaintiff purchased her vehicle, she relied upon representation of Mercedes that the cars had been inspected and any interior trim defects, including those in the Burl Walnut Wood Trim, were "taken care of" prior to placing the vehicles on the market.

84.     Further, Plaintiff relied on the representation that her vehicle would "achieve [the] high quality levels expected of Mercedes" and that if Mercedes had knowledge of a defect it would "[implement] measures to continuously improve."

85.     Since 2010, "[t]he best or nothing" has been the slogan used in almost every media campaign created by Mercedes to describe its vehicles. When "[t]he best or nothing" slogan was first rolled out, Joachim Schmidt, executive vice president-sales and marketing for Mercedes at its global base in Stuttgart, Germany, stated: "For us, that means we want to deliver the very best in all areas

- be that in research and development, production, sales, service and aftermarket business or in purchasing." According to Mr. Schmidt, the claim made in the new slogan is reflected in Mercedes' core values of perfection, fascination, and responsibility and is also a part of its corporate culture. Autotrader, *Mercedes-Benz has New Global Slogan: The Best or Nothing* (June 2010), https://www.autotrader.com/car-news/mercedes-benz-has-new-global-slogan-best-or-nothin-67400.

86.    Mercedes states in its Vehicle Care Guide, the "emotional experience" that results from the "visual presence" of its vehicles "is why every visible surface has been crafted with the finest materials and coatings to ensure the best appearance and durability customers that "[a]s you might expect, aside from its visual attractiveness, the appearance of your Mercedes-Benz is a main component of its high resale value. (a long-standing additional ownership benefit)."

87.    The interior of the vehicle is an essential part of that attractiveness and appearance, and it drives the "high resale value" of the Class Vehicles. According to Mercedes, "a sense of flow isn't limited to the vehicle´s exterior. It continues within, where elegant lines outline a space of pure refinement. While the materials, workmanship, engineering, manufacturing, development, and design considerations

that go into a Mercedes-Benz interior are countless, there is only one goal: When you step inside and close the door, you should feel at home. We achieve that through painstaking craftsmanship, applied to even the smallest details."   Further, "[s]pecialists select the color palette and materials for every interior surface. Textures, gloss levels, grain and other details are chosen based in part on their ability to convey high levels of quality."

88.    Mercedes touts its interiors and states that "[c]ollectively, all interior elements should create a driving environment that makes occupants feel both at ease and in control. The care and craftsmanship with which every Mercedes-Benz is built should be readily apparent."   Nonetheless, Mercedes knew that this particular interior, the Burl Walnut Wood Trim interior, was far from any standard that it touts to consumers and its customers, and it knew this at the very beginning of the run of its W212 vehicles.  Despite that, Mercedes is still offering CPO versions of these vehicles today, and with incentives.



MY 15/16/17 E-Class

Finance Rate
1.99% APR [5]
For 36 Months


Contact a Dealer

Offer Details ⌃

89.    With respect to CPO vehicles, as a "certified pre owned" Mercedes vehicle, Mercedes touted its "painstaking certification process." Indeed, "[t]o qualify

for Pre-Owned Certification, a Mercedes-Benz vehicle must meet stringent criteria and pass a rigorous inspection." That inspection includes a "32 Point Appearance Inspection," three of which cover "Trim" ("Wood and / or Chrome Trim," "Trim and Moldings," and "Door Panels"), to ensure that every "Certified Pre-Owned vehicle is a clean-skinned beauty . . . with high quality fit and finish, inside and out." Plaintiff and Class members relied upon Defendants' "certification" which ultimately was found to be deceitful and could not have been actually conducted if the Burl Walnut Wood Trim was not replaced or repaired before being sold, given Defendants direct knowledge of the defect.

90.    These advertisements and marketing related to the vehicle interior led Plaintiff and the putative Class members to form a reasonable belief and expectation that the interior Burl Walnut Wood Trim used on the Class Vehicles was of high quality, would endure, and positively impact the value of the Vehicles.  Not only did Defendants make representations regarding the quality, durability, and resale value of the Class Vehicles, but they also make representations regarding the high quality and standard of the repairs they make to the Class Vehicles.

91.    As a result, each Plaintiff was caused to expect that the interior trim and the application process used on the Class Vehicles, including any UV protectant, would not cause the interior trim to fade, discolor, and become cloudy under normal

conditions and cause other problems that would negatively impact the value of the Class Vehicles.

92.    Plaintiff and the putative Class members were exposed to Defendants' pervasive, long-term, national, multimedia marketing campaign touting the supposed quality and durability of the Class Vehicles and their component parts, including interior trim, and they justifiably made their decisions to purchase their Class Vehicles based on Defendants misleading marketing that concealed the true, defective nature of the Burl Walnut Wood Trim interior used in the Class Vehicles.

93.    Plaintiff and Class, in deciding to purchase the Class Vehicles, relied upon Mercedes to inform the public and potential purchasers of Mercedes cars of any defects in the Class Vehicles, including defects in the Burl Walnut Wood Trim. Mercedes failed to inform Plaintiff and Class of the defect with the Burl Walnut Wood Trim interior, and Plaintiff and Class would not have purchased the vehicles had they known of the defects in the interior, or they would have paid a much lower price for the vehicles had they known of the defect.

**A.    <u>Mercedes Knew of the Burl Walnut Wood Trim Interior Defect Prior to Sale or Lease of the Class Vehicles.</u>**

94.    Defendants were aware of irreparable defects with the Burl Walnut Wood Trim interior used in Class Vehicles.  Defendants were aware of these defects

at the time it advertised and sold the Class Vehicles and thereafter when it continued to disseminate information about the vehicles for Plaintiff and those putative Class members who purchased their Class Vehicles on the primary and secondary market.

95.    At those times, the defects with the Burl Walnut Wood Trim interior that Mercedes knew about included—but were not limited to—defects in the manufacture, process, materials, and workmanship of the vehicle.  Mercedes failed to inform Plaintiff and the putative Class members about the defects, and the defects have rendered the vehicle unmerchantable.

96.    Prior to a new interior trim system being used on a vehicle, automakers such as Mercedes typically employ multiple standards and test protocols to ensure long life and film integrity of the interior trim system. In addition to extensive exterior and accelerated weathering evaluation of materials there is additional aggressive testing prior to the qualification of an automotive interior trim systems to ensure the system will endure when exposed to environmental elements. These tests often run over the course of two-to-five years before a vehicle using the interior trim system is brought to market.

97.    Most of these test procedures are developed and standardized by the American Society for Testing and Materials ("ASTM") and the Society of Automotive Engineers ("SAE"), and typically include:

98.    On information and belief, Mercedes performed several of the above-described ASTM and SAE test procedures. In fact, Mercedes has developed what is referred to as "Mercedes SAE Standards & Testing" that are used in connection with the testing of its vehicles, including DBL 5471 for a test relating to the "Trim & Molded Padded Parts for Vehicle Interiors (composite parts)" and DBL 5307 "Frame Retardant Properties / Interior Trim Parts," as well as various other tests relating to the performance of the interior trim materials used on its vehicles, including the Class Vehicles, in simulated real-world conditions. Applied Technical Services, Mercedes SAE Standards & Testing, http://www.atslab.com/automotive-testing/mercedes-sae-standards-testing.php (last visited March 27, 2019).

99.    The development of the Burl Walnut Wood Trim system, including the testing performed in connection therewith, would have revealed the trim defect. The details regarding the testing performed by Mercedes and the results of that testing are in the exclusive custody and control of Mercedes.

100.    On information and belief, prior to the manufacture and sale of any of the Class Vehicles, Mercedes knew of the Burl Walnut Wood Trim defect through, or as evidenced by, sources such as pre-release materials, workmanship,

engineering, manufacturing, development, design and testing information; technical service bulletins; service center data; early consumer complaints made directly to Mercedes, collected by NHTSA ODI, and/or posted on public online vehicle owner forums; testing done, including testing in response to consumer complaints; aggregate data from Mercedes dealers; and other internal sources unavailable to Plaintiff and Class members without discovery.

**B.     Mercedes Knew of the Burl Walnut Wood Trim Defect from Its Own Technical Service Bulletins.**

101.   Defendants were aware of and on actual or constructive notice about the above referenced complaints and investigations.

102.   As noted above, Defendants have previously issued a Technical Service Bulletins (TSBs) concerning the defect with the Burl Walnut Wood Trim used in its vehicles.  On at least as early as November 22, 2010, Mercedes issued the First TSB (TSB # LI68.10-P-050415 Version 2).  *See* Ex. A. The First TSB concerns "Model W212/S212 Affected VIN range: A000988 to A291888 with burl walnut wood trim (sales code 731)" and cites the issues as "[f]ading or discoloration of the burl walnut trim."  *Id*.  A visual example of the defect being exposed was provided as follows:



103.   According to Defendants, "[t]he most common affected areas are either behind the SRS label . . . or on the front doors when removing the interior shipping protection material" although "[o]ther areas may also be affected." *Id.*  The cause of the problem was identified as "[i]nadequate UV (ultra violet) ray protection." *Id.* The remedy identified was to "[r]eplace all wood trim panels with parts kit number as per SI68.30-P-0003A." *Id.*  Defendants instructed dealers to "[p]lease use damage code for most affected part with damage type "XX." *Id.*

104.   The First TSB noted that to fix the issue and replace the trim, the following work had to be done:

- "Remove/install trim strip on dashboard"

- "Remove/install stowage compartment or ashtray housing"

- "Disassemble/assemble center console"

- "Assemble/disassemble door liner in rear Door"

- "Disassemble/assemble front door liner"

Ex. A, p. 2.

105.   However, if the defect was not already detectible to the eye, the First TSB instructed dealers to conceal the defect by removing any coverings, including stickers, from the affected areas so that any such fading, discoloration, or cloudiness would not be noticeable as compared to the covered area when any coverings or stickers were removed.

106.   Specifically, Defendants instructed that "[i]f fading or discoloration is not present then relocate the SRS label to an area on the instrument panel / lower control panel (Fig. 2) and remove any interior transportation protection material from the wood surfaces, such as used on the doors."



Ex. A, p. 1-2

107.    On November 25, 2013, Defendants issued the Second TSB (LI68.30-P-053962), which contained substantially the same information as the first except expanded the Class Vehicles from a finite VIN # range ("A000988 to A291888 with burl walnut wood trim (sales code 731)") to the entire W212 series, including "MODEL 212 with CODE (731) Burled walnut veneer wood finish trim" and "MODEL 212 with CODE (W60) Burled walnut veneer designo wood trim, brown." *See* Ex. B, p. 1 and Ex. C, p. 1.  Like the First TSB, the Second TSB noted the defect

which caused "[f]adding of the burled walnut veneer wood finish trim parts" that was caused by "UV radiation." *Id.* The Second TSB noted that the damage code for affected components is damage type "26." *See* <u>Ex. B</u>, p. 2 and <u>Ex. C</u>, p. 2.

108. As noted above, on August 18, 2015, Mercedes issued a ninth version of the Second TSB "LI68.30-P-053962," with the same title as version four of the Second TSB.

109. Mercedes knew of the Burl Walnut Wood Trim defect from at least as early as the date it decided to initially issue the First TSB (November 22, 2010). Upon information and belief, it takes between six months to more than one year (or longer) from the start of a defect investigation to the issuance of a TSB, such as the TSBs issued here. Accordingly, based on the second version of the First TSB alone, Mercedes knew of the Burl Walnut Wood Trim defect as early as November of 2009 and no later than February of 2010. In addition, Mercedes knew that the Burl Walnut Wood Trim defect had not been remedied and continued to affect the Class Vehicles, as evidenced by the issuance of multiple versions of the TSB over the course of multiple model years, including up and until the last year of the W212 model. Shockingly, despite the fact that Mercedes admitted to the Burl Walnut Wood Trim defect back in 2010 when the First TSB was issued, it chose to deceive consumers and instruct dealers on how to hide the defect if it has not become apparent to the

naked eye.  Indeed, Mercedes continued to use the same defective Burl Walnut Wood Trim on the Class Vehicles for six more years.

**C.    Mercedes Knew of the Burl Walnut Wood Trim Defect from Class Member Complaints Made Directly to Mercedes.**

110.    Mercedes also knew about the Burl Walnut Wood Trim defect based on complaints made directly to Mercedes. The large number of complaints, and the consistency of their descriptions of fading, discoloration, and cloudy appearance caused by the defective trim, alerted Mercedes to this substantial defect affecting its most popular and highest selling vehicle.

111.    Information as to the full extent of complaints made directly to Mercedes about the defective trim is information presently in the exclusive custody and control of Mercedes and is not yet available to Plaintiff prior to discovery.

112.    However, many Class Vehicle owners complained directly to Mercedes and Mercedes dealerships about the Burl Walnut Wood Trim defect issues they experienced. The number and consistency of these complaints should have alerted Mercedes to the existence of the Burl Walnut Wood Trim defect and some of these are reproduced below:

- "My case is under consideration. Will know soon what they decide. Here is the photo of what I sent them regarding the fading. It is most prominent on the dashboard trim. You can see from the picture that the dash trim is really 'washed out' . . . ." Posted on mbworld.org June 10, 2015.

- "When I was researching the MB ELW, my SA at my local MB dealer said the faded wood was not covered under the ELW. . . . I agree that if your complaints are noted on the service record then that helps your cause. The fading is pretty noticeable and you and the dealer should be able to spot it. Of course the dealer could be telling you it's not faded when it is. If you are very concerned, you could check with another dealer or post some pics here for other opinions."  Posted on mbworld.org June 28, 2015.

- "just want to give an update on my case too, my service advisor have been very helpful, however, after submitting the case for approval, MB only decide to cover the labor on the repair, not the parts, I wish it would be the other way around. Currently I'm in the process of drafting an email to MBCC, I'm going to try to push as hard as possible on this . . . ."  Posted on mbworld.org July 8, 2015.

- "I am just suspicious about how this faded wood is being handled in general - maybe it's how MBUSA handles it and not the dealer's fault. For one, the customer has to bring it up and complain as stated in the TSB. Unless you are familiar with the issue from reading about it here, most folks won't realize their wood is faded. Ideally the dealer would point out the issue when they see the car for routine service and ask if the customer would like it addressed. But when I asked about this at my dealer, the SA told me that they're told not to bring it up, the customer has too. MBUSA will only cover it if they document that the customer complains. Maybe some dealers are doing their customers a favor and bringing it up - you would think they would do that so they'd get the work. Then you read about a situation like the OP's where they just replace one piece."  Posted on mbworld.org July 10, 2015.

- "Hi, have a CPO 2014 E350 4Matic, purchased with 22K miles in 2016, with (I think) walnut wood trim. The wood has faded noticeably - on the dash, center console and the doors. It's been garaged since I picked it up, and presumably since new. Has anyone else had this problem and had any luck getting it covered under the CPO warranty? I called my local shop and they initially said it would be covered but when I brought it in they said just the opposite (with an attitude)."  Posted on mbworld.org October 20, 2018.

- "I agree completely. It's impossible to ignore and impacts the driving experience. Then MB tries to hide behind a warranty exclusion when the car's only five years old! I will fight this with MB US. Over the years, my wife and I have had 1 Lexus, 2 Audis, 2 BMWs, 4 MB's, we maintain them by the book and they look and run excellent when we move on to our next car. None of these cars has had any type of interior problem, except for this one. What I learned from posting is that this has been a known problem, for years. MB knew about it and didn't disclose it when it sold the car to me. To say that I am extremely annoyed would be an understatement." Posted on mbworld.org October 21, 2018.

- "Well MB finally got back to me. They're offering to pay half of the parts cost, and that's it. Not happy and not going to do it."  Posted on mbworld.org February 3, 2019.

- "I am one of the unsuspecting fools that got faded wood. easy way to tell is open the doors. The piece between the door and the drivers side fuse panel is as it is supposed to be dark. Everywhere else faded. I like the wrap idea but probably still have to pull panels and trim to get a real good fit around and a nice tight professional looking install. Sounds like previous owners either didn't know, didn't care or didn't fight MB hard enough to get it replaced. Not the worst thing in the world. Yes cheap and should have had better UV protection but yes probably a half a million extras that the want to get rid of either through warranty or production. Just because they improve product usually it goes to future vehicles."  Posted on mbworld.org February 3, 2019.

- "Now I'm embarrassed to share pictures of my faded wood. Looks gray in places like OP's. No luck with goodwill out of warranty unless you count a service coupon of 15% off $3k or whatever they wanted for it."  Posted on mbworld.org February 7, 2019.

- "The dealer said he would talk to the regional manager. So I phone head office to find out if any of this has been logged anywhere because I complained. Wouldn't you know it, no complaint logged anywhere.  So I lodge a complaint with head office! Shortly after that the dealer leaves a message on my vm saying they wouldn't provide a free replacement. Covering their [bases] more than anything else it seems. Even Hyundai has

better quality when it comes to wood trim. A real disappointment." Posted on mbworld.org September 4, 2017.

- "I have a 2011 E550 where all of the simulated wood trim is badly faded. I took the car to mercedes of culter bay to have it verified at the request of mbusa. It was, and despite it being a known issue which caused the need to change products for production, mbusa, their answer was; tough luck because it was a couple K miles from warranty." Posted on mbworld.org October 18, 2014.

- "I have the same problem. The wood trim is fading on my 2010 E350, and I've contacted the MB US Headquarters. They agreed to pay for the materials, but I need to pay for the labor fee which is more than 800 dollars. Since this was their fault for not putting a UV protection layer on the trim, this is completely unreasonable. The customer service at HQ that I talked to were unhelpful and impolite (the lady hung up on me when I wanted to talk to a supervisor), and my case went nowhere. I don't know what the next step is, but if we've got enough people here with the same problems, I think we can figure something out." Posted on mbworld.org November 2, 2014.

- "I have the same issue with my 2011 E350 out of warranty (by time not mileage). After dealer verification and talking to mbusa, by request, they told me to take a hike. Very disappointed - this is my 9th MB and I have never had even a hint if fading trim in these cars." Posted on mbworld.org October 11, 2015.

- "I have a CPO 2011 E350, and got declined on the repair, but I have more than 5 MB dealership in 50 miles range, should I try the rest of them?" Posted on mbworld.org October 13, 2015.

- "My local dealer told me to go to MBUSA. MBUSA said they would not offer any goodwill but did ask dealer to provide a discount. IIRC they offered to take 15% off but it was still too rich for my blood. MBUSA told me that since I bought it from a non-MB dealer, was a first time MB owner and it was out of warranty (by 200 miles) when I purchased it that I was not eligible for any consideration. Sad to see that folks who have owned 9 MB's or others who purchased from a MB dealer and being treated the

same way. So much for loyalty."    Posted on mbworld.org October 13, 2015.

- "I too have this problem with my 2010 e350. I just purchased this car about a week ago and hadn't noticed the faded trim until my girlfriend mentioned it to me after I took it home. Having never owned a mb I assumed the wood grain was a faded/beige color. After comparing to the wood grain of the cup holder and steering wheel, It was night and day. Makes the car depreciate a lot more now that I can't unsee it.  Compare the wood grains one the dash vs the cup holder and steering wheel.  I contacted mbusa and spoke with a customer rep who wasn't too friendly. She ultimately told me to go to a local dealer to have them look at it and contact upper management as a goodwill claim. I went to Mercedes Burlington and now am waiting for someone to contact me. I'm highly doubtful I'll get any goodwill as this is my first MB and it was purchased privately." Posted on mbworld.org November 1, 2015.

- "I have 2011 E350 and started noticing that the wooden trim around the dash board is beginning to fade exhibiting cloudiness, discoloration and sun-spots. I am aware that there was a technical bulletin for this problem on earlier W212s. However my VIN number falls well outside the range of the affected cars.  Took the car to Mercedes Benz San Diego and showed it to the service advisor and his manager. First they tried to tell me that it was a normal occurrence of wood 'maturing' in the sun. When I pointed the color difference between the color of the wood trim around the dashboard and the ones on the doors, they agreed that there was definitely fading. The service advisor took pictures with his iPhone and promised to escalate it directly to MB HQ to get their guidance.  Today (two weeks later) I get a call from SA with an offer. He claimed that it would cost MB over $3000 to replace all the wood trim in the car but they would be willing to do it if I would cover $1000! They could also replace just the faded pieces under warranty but, obviously, they wouldn't match the rest of the wood trim around the car.  I am getting impression that the dealer is trying to cut corners and get away with doing the work. No reasonable person would replace just several wood panels to ruin the look of the interior. But I am also not insane to pay $1000k for something that should be done under warranty. I think they know this and using this tactic for me to just go

away.  What do you guys think? I am going to try a different dealer but is there a way to escalate this issue?" Posted on mbworld.org July 12, 2012.

- "Well, I got a call back from the customer rep who reviewed my case. They said they will not make a goodwill adjustment in my case. Their reason why was I just purchased the vehicle (not a long term owner) and it is also my first MB (everyone has a first right). I asked who could I appeal their decision to and they said no one. No supervisor can review - the rep is empowered by executive management. More warm fuzzies. Despite my personal situation, what I can't seem to get past is the fact that they are not concerned with an inferior product that they provided their customers. Why was this not recalled and required to be replaced? Why are they only doing this for customers who complain during the warranty period? If they know their product is defective they should fix it even if that means issuing a recall. Imagine how many people out there don't know about this and are driving around with faded wood. Most of them with 2010 or 2011 models with this issue are either out warranty or less than a year from expiration. They might be thinking to themselves that the quality of MB has gone down. People that see their cars may also get the same impression. I know this is not a faulty GM ignition switch. It is cosmetic. And I understand that all car parts show their age with time and use. But many have reported the fading right when they bought their cars. Heck this thread started 3.5 years ago. Maybe if I wait long enough and others out of warranty have this issue they will eventually address it. Not holding my breath..." Posted on mbworld.org April 3, 2014.

Accounts of this problem and attempts to get Defendants to fix the issue are countless.  Defendants are well aware of this issue and refuse to cover it under warranty, and upon information and believe, some individual dealers have fixed the issue and absorbed the cost under a "goodwill account."

113.  Even more surprising, even where the Burl Walnut Wood Trim has been repaired/replaced, even the replacement Burl Walnut Wood Trim has faded,

discolored, and been rendered cloudy in appearance.  In other words, the repair kits for the Burl Walnut Wood Trim are just as defective as the original Burl Walnut Wood Trim installed in the Class Vehicles in the first instance.

114.  Defendants are aware that replacement Burl Walnut Wood Trim fades, discolors, and becomes cloudy just like the original trim, yet they continue to replace defective Burl Walnut Wood Trim interior with equally defective Burl Walnut Wood Trim interior.  Unsurprisingly, this leads to the need to replace it yet again, and in short order.  Many Class Vehicle owners complained directly to Defendants and Mercedes dealerships about the Burl Walnut Wood Trim defect issues they experienced even with the replacement trim. The number and consistency of these complaints should have alerted Mercedes to the fact that replacing the Burl Walnut Wood Trim with equally defective wood trim does not solve their customers' problems.  Some Class members' experience with this and reporting to Defendants are reproduced below:

- "Folks, I just wanted to report some good news. I just got my faded wood recently replaced... a second time. The first time was in 2013, entire wood trim replaced under warranty, and it didn't take long for the wood to fade again. . . .  was out of warranty. They replaced all of the wood trim. Luckily after working with a customer service and the local dealer, the repair was good-willed" Posted on mbworld.org September 3, 2017.

- "My CPO and then my extended has been covering this problem because I had the first set replaced under the factory warranty. I'm

on my 4th full wood trim replacement on my 2010 E350 4Matic because the replacements get milky quicker then the original. This is the 4th time at $3,000 a pop courtesy of MB, and whomever their subpar supplier may be?"  Posted on benzworld.org on May 11, 2015.

115.  This problem was also documented in an article from "NBC 6 Responds," a "consumer investigative center" at NBC Miami Channel 6.  *See* https://www.nbcmiami.com/news/local/Cars-Wood-Trim-Fades-in-Hot-Florida-Sun-431177953.html  There, Lawrence Mintz documented his experience with the defective Burl Walnut Wood Trim.  "When his 2010 Mercedes E-350 was just three years old, the trim had faded and he had it replaced.  This car was still under warranty, so the fix was free."  *Id.*  "Fast forward to 2017 and the wood trim has faded again. [That time, he was] told the repair will come out of his pocket."  *Id.* Defendants told him that "it would cost [him] $3,800 to replace the wood."  *Id.*  NBC 6 Responds got involved and publicized the matter, and only after the public shaming and aggressive advocacy from NBC 6 Responds did Defendants finally capitulate and replace the trim pursuant to a "goodwill gesture."  This, however, does not protect him in the future for when that second trim inevitably fades, discolors, and becomes cloudy just like his first two trim packages because Defendants are simply replacing defective Burl Walnut Wood Trim with equally defective Burl Walnut

Wood Trim.    This is no solution because it just kicks the can down the road and gives Defendants a stronger argument that they should not be forced to replace it.

116.   Further, knowledge of the defect is evidenced by recognition of an issue with the Burl Walnut Wood Trim defect by the Mercedes' employee Plaintiff spoke with about their vehicle's trim issues when they complained directly to Mercedes. For example, Callen was specifically told by an employee at the Mercedes dealership that Mercedes knew about the defect and it was a problem with the Burl Walnut Wood Trim.

**D.    Mercedes Knew of the Burl Walnut Wood Trim Defect from Repair Data.**

117.   Mercedes also knew or should have known about the Burl Walnut Wood Trim defect because of the large number of replacement/repair jobs it performed on vehicles with Burl Walnut Wood Trim interior due to fading, discoloration, and the cloudy appearance of the trim.

118.   For instance, the service department manager at the Mercedes dealership expressed to Callen that he had been involved in replacing numerous Burl Walnut Wood Trim interiors in Class Vehicles.

119.   Upon information and belief, Mercedes collects, reviews, and analyzes detailed information about repairs made on vehicles at its dealerships and service centers, including the type and frequency of such repairs. Complete data on such

repairs is exclusively within Mercedes's control and unavailable to Plaintiff prior to discovery.

**E.    Mercedes Knew of the Burl Walnut Wood Trim Defect from Class Member Complaints Collected by NHTSA's Office of Defect Investigations.**

120.    Mercedes knew or should have known about the Burl Walnut Wood Trim defect based on manufacturer communications with the NHTSA.

121.    Federal law requires automakers like Mercedes to be in close contact with NHTSA regarding potential auto defects, including imposing a legal requirement, backed by criminal penalties for violation, of confidential disclosure of defects by automakers to NHTSA, including field reports, customer complaints, and warranty data. *See* TREAD Act, Pub. L. No. 106-414, 114 Stat. 1800 (2000).

122.    Thus, automakers should and do monitor NHTSA databases for consumer complaints regarding their automobiles as part of the automakers ongoing obligation to identify potential defects in their vehicles, including material and workmanship related defects, such as trim defects causing fading, discoloration, and a cloudy appearance to the interior trim.

123.    From its monitoring of the NHTSA databases, Mercedes knew or should have known about the defective Burl Walnut Wood Trim which was demonstrating fading, discoloration, and cloudiness in its appearance.

**F.     Mercedes Knew of the Burl Walnut Wood Trim Defect Based on Class Member Complaints on Public Online Forums.**

124.  In  addition  to  complaints  made  directly  to  Mercedes  and communications with the NHTSA, many Class Vehicle owners posted complaints about the Burl Walnut Wood Trim defect on public online vehicle owner forums. The following is a small sampling of such complaints:

- "My wood trim on my 2010 E350 is fading. I only have 12.500 miles and have kept the car garaged mostly. I noticed in another forum some people have the same problem. I went through the first 10-15 pages here and didn't see anything. Is anyone else having this problem. I found this bulletin, LI68.10-P-050415, option code 731 (burl wood). Affects VIN series A000988 through A291888 on another site. I brought the car in last week and was told they would replace the wood early this week. Now they're telling me there is a national back-log on the trim and cannot say when they will get it. Is there that big of a problem with the wood trim? Anyway, I posted a quick [video] to display my wood trim fading."  Posted on benzworld.org October 16, 2013.

- "I just purchased a 2010 e350 last Friday. Unbelievably enough, I did not notice the fading until I sat in the passenger seat in the daytime earlier today. The fading is really bad. I noticed it just before heading to the dealer - asked the dealer about it and they said it would be $4k to replace!!!  My car is out of warranty due to miles. Any suggestions?? Posted on mbworld.org on June 11, 2010."  Posted on benzworld.org January 20, 2014.

- "Just to say that I too had fading wood on my 2010 E350. The car was out of MB warranty but still covered under the dealer 1 year CPO.  Of course the dealer 1 year CPO does not include warranty on this item.  I appealed to reason and the dealer said they'd do it if I paid the labor, which is about $450. I found this to be acceptable since I knew the wood was not covered under the dealer CPO warranty (the sales guy was helpfully clear that it

only covers mechanical stuff at the time I bought the car). The wood kits are $2300 so the full nut would have been $2750. So good for the dealer and I'll get the problem fixed. Wish I knew about it at the time of purchase but such is life." Posted on benzworld.org August 29, 2014.

- "Just for everyone's information. The Mercedes part number for the burled walnut replacement trim kit is 2126801293 (or A2126801293 if you like putting the A in front). List price for this is $2900. I have reports of people getting it for just under $2000 but not's on a good day. My interior is fading and I am out of warranty (in time not milage) and MB will not help. So, even if your interior trim is not fading severally, I'd recommend taking it in and having it replaced before your warranty runs out and you are on your own. And, please, if you find any good pricing out there please pass it along." Posted on benzworld.org October 7, 2015.

- "I agree and did talk to MB and was rejected. I intend to take it a bit further than that - but really don't want to hijack this thread. I'd simply recommend that others use their warranty to it's full extent especially on this issue because it needs to be addressed. As I said in an earlier post - I have had 8 others of varying levels of age (see sig) and never saw this issue until the W212 which is, otherwise, an excellent vehicle. It's extremely disappointing." Posted on benzworld.org October 7, 2015.

- "Hello everyone. Does anyone know if this is also a common problem on w212 2013 e350 wagons? I recently bought mine from dealer with original factory warranty left over. I have noticed some fading in certain areas. Should this be covered under warranty. Thanks in advance." Posted on benzworld.org July 4, 2016.

125.  As shown by this small sampling of complaints from forums and websites such as www.mbworld.org and www.benzworld.org, which are shown directly above and the other public forum complaints referenced above in this Complaint, consumers have been vocal in complaining for years about the Burl

Walnut Wood Trim defect and the damage it has caused.  A multi-billion-dollar vehicle materials, engineering, manufacturing, development, and design company such as Mercedes undoubtedly tracks and has tracked such sites and was aware or should reasonably have been aware of the Burl Walnut Wood Trim defect in the Class Vehicles.

126.    In sum, Mercedes has actively concealed the existence and nature of the latent defects with the Burl Walnut Wood Trim interior from Plaintiff and the putative Class members since at least early 2010 despite its knowledge of the existence and pervasiveness of the Burl Walnut Wood Trim, and certainly well before Plaintiff and the putative Class members purchased their Class Vehicles. Specifically, Mercedes has:

a.    failed to disclose, at and after the time of purchase, lease, and/or service, any and all known material defects of the Class Vehicles, including the interior trim defect;

b.    failed to disclose, at and after the time of purchase, lease, and/or service, that the Burl Walnut Wood Trim in the Class Vehicles were defective and not fit for their intended purposes;

c.    failed to disclose, and actively concealed, the fact that the interior trim and UV protectant used on the Class Vehicles were defective, despite

50

the fact that Mercedes learned of the defect as early as 2010, and likely even earlier;

d.    failed to disclose, and actively concealed, the existence and pervasiveness of the Burl Walnut Wood Trim defect even when directly asked about it by Class members during communications with Mercedes, Mercedes Customer Assistance, Mercedes dealerships, and Mercedes service centers;

e.    actively concealed the trim defect by forcing Class members to bear the cost of replacing the Burl Walnut Wood Trim, while at the same time performing those services at no (or lower) cost for certain of those who complained vocally and often, and even then, often requiring dealers to utilize their "good will" account instead of recognizing the issue for what it is—a known defect that Defendants have attempted to hide for almost 10 years;

f.    actively concealed the interior trim defect by inadequately repairing or replacing the Burl Walnut Wood Trim in the Class Vehicles such that the replacement trim also fades, discolors, and becomes cloudy in the same way the original did, and as a result, the trim defect has never been permanently corrected in the Class Vehicles, even though Plaintiff

and the putative Class members were led to believe that the services would cure, and, in fact, had cured the trim defect in their Class Vehicles;

g.  actively concealed the trim defect by knowingly repairing or replacing the Class Vehicles with the same defective Burl Walnut Wood Trim, while knowing and concealing that the replacement or repair to the Class Vehicles would not prevent and/or cure the problems associated with the defect because the replacement trim used in the Class Vehicles remained defective; and

h.  actively concealed the trim defect by knowingly repairing or replacing the Class Vehicles with Burl Walnut Wood Trim using the same process, in both manufacturing and application, while knowing and concealing that repairing or replacing the trim in the vehicles with the same Burl Walnut Wood Trim would not prevent and/or cure the problems associated with the trim defect because the process by which the Burl Walnut Wood Trim was manufactured and installed in the Class Vehicles remained defective.

**<u>DEFENDANTS' INADEQUATE REMEDY</u>**

127.   As evidenced by the repair instructions in the First and Second TSBs, as well as the experiences of Class members and the estimates they have received after their Class Vehicles experienced the interior trim defects, repairing or replacing the Class Vehicles, even if done properly, does not cure the trim defect and does not remedy the diminution of value that occurs as a result of the removal of the original interior.

128.   As shown above, Defendants alleged solution, which it sometimes covers under warranty but usually does not, just kicks the can down the road because the replacement Burl Walnut Wood Trim interior pieces are just as defective as the original Burl Walnut Wood Trim that it replaced—in other words, the Burl Walnut Wood Trim, even if replaced, is replaced with defective Burl Walnut Wood Trim and is a ticking time bomb that is guaranteed to fade, discolor, and become cloudy again.  Defendants appear to have adopted a strategy of fixing the issue where it is absolutely necessary (*e.g.*, when a consumer watchdog like NBC 6 Responds intervenes) in the hope of wearing out its customers with the hopes that they accept the fate of their alleged luxury interior trim.

129.   However, even if the Class Vehicles were properly repaired without Defendants simply installing another defective Burl Walnut Wood Trim, their values would still be diminished, as altered newer vehicles are worth less than vehicles with

original interiors. Indeed, there is a stigma associated with interiors that are altered in vehicle, especially from a luxury brand like Mercedes, and the fact that a vehicle's interior has been altered is often used by a potential buyer as a bargaining chip to lower the price.

130. In addition, anticipated car purchasers often shy away from a vehicle that has its interior altered, as it rings alarm bells that the vehicle may have been damaged in an accident or subjected/exposed to unnatural conditions and replaced as a result. A non-original interior could also be an indication of major repairs to the Class Vehicle that are being hidden.

131. In fact, Mercedes even tells its dealers that when evaluating vehicles for inclusion in its CPO Program that they "ensure our Certified Pre-Owned vehicles offer the hallmark appearance of a Mercedes-Benz" and to "evaluate and address any areas in need of repair or refinishing—both inside and out—to provide the high-quality finish for which Mercedes-Benz is known."

132. Indeed, Mercedes dealerships know about the issues with the Burl Walnut Wood Trim interior and factor that into their decisions to purchase and offer that vehicle for sale, whether through the CPO program or otherwise, which results in the value being worth less than it otherwise would be, and especially if it is already displaying fading, discoloration, and cloudiness.

133.   Kelley Blue Book ("KBB") similarly bases its appraisals on the condition of the vehicle. KBB divides the condition of used vehicles into the following four grades:

**Excellent** condition means that the ***vehicle looks new***, is in excellent mechanical condition and needs no reconditioning. This vehicle has never had any paint or body work and is free of rust. The vehicle has a clean Title History and will pass a smog and safety inspection. The engine compartment is clean, with no fluid leaks and is free of any wear or visible defects. The vehicle also has complete and verifiable service records. Less than 5 percent of all used vehicles fall into this category.

**Good** condition means that the vehicle is ***free of any major defects***. This vehicle has a clean Title History, the paint, body ***and interior have only minor (if any) blemishes***, and there are no major mechanical problems. There should be little or no rust on this vehicle. The tires match and have substantial tread wear left. A "good" vehicle will need some reconditioning to be sold at retail. Most consumer owned vehicles fall into this category.

**Fair** condition means that the ***vehicle has some*** mechanical or ***cosmetic defects*** and needs servicing but is still in reasonable running condition. This vehicle has a clean Title History, ***the*** paint, body and/or ***interior need work performed by a professional***. The tires may need to be replaced. There may be some repairable rust damage.

**Poor** condition means that the ***vehicle has severe*** mechanical and/or ***cosmetic defects*** and is in poor running condition. The vehicle may have problems that cannot be readily fixed such as a damaged frame or a rusted-through body. A vehicle with a branded title (salvage, flood, etc.) or unsubstantiated mileage is considered "poor." A vehicle in poor condition may require an independent appraisal to determine its value.

134.   In other words, the vehicle's interior, including trim, has a substantial effect on resale value and can degrade the value of a car to "fair" condition in a car that is otherwise in "excellent" or "good" condition.

### PLAINTIFF AND CLASS MEMBER WERE DAMAGED BY THE BURL WALNUT WOOD TRIM DEFECT

135.   Plaintiff and the putative Class members purchased or leased the Class Vehicles based on their reasonable but mistaken belief that their Class Vehicles were of high quality, durable, and free of defects. However, the Class Vehicles delivered by Mercedes were not those for which Plaintiff and the putative Class members bargained. Rather, the Class Vehicles suffered from a common defect—the Burl Walnut Wood Trim defect. Had Plaintiff and the putative Class members known of the trim defect, they would have either: (a) paid substantially less for the Class Vehicles; (b) required an immediate remedy that restored the Class Vehicles to the conditions bargained for; or (c) not purchased or leased the Class Vehicles.

136.   Because of the disparity between the quality of the Class Vehicles negotiated for and the Class Vehicles actually received, Plaintiff and the putative Class members suffered economic harm.

137.   This economic harm can be quantified as: (a) the economic value of an effective remedy that restores the Class Vehicles to their expected conditions (or the economic harm from the lack of that remedy); (b) the discount that Plaintiff and the

putative Class members would have required to accept the Class Vehicles in their actual condition; and/or (c) the diminished value of the Class Vehicles, both those that have had their Burl Walnut Wood Trim repaired or replaced and those that have not.

138.   Plaintiff and the putative Class members paid premiums to purchase and lease the Class Vehicles as a result of the brand, quality, durability, and value representations made by Mercedes. A vehicle purchased or leased with the reasonable expectation that it is of high quality and durable as advertised is worth more than a vehicle known to be subject to the problems or risks associated with the Burl Walnut Wood Trim interior. Plaintiff and the putative Class members were harmed from the day they drove their Class Vehicles off the lot because they did not get what they paid for—a high-quality and durable vehicle that would retain its value under normal conditions.

139.   As a direct result of Mercedes' misrepresentations and omissions, Plaintiff and the putative Class members overpaid for their Class Vehicles and did not receive the benefit of their bargain. Plaintiff and the putative Class members paid a premium for the Class Vehicles, which Mercedes advertised as being durable and of high-quality, and received Class Vehicles that contained a known but concealed defect. Mercedes was unjustly enriched because it obtained and retained monies paid

by Plaintiff and the putative Class members who paid a price for the Class Vehicles that was higher than the value of the vehicles they received in return.

140.   In addition, the widespread disclosure of the trim defect has caused a decrease in the value of the Class Vehicles, and, therefore, Plaintiff and the putative Class members have suffered a direct pecuniary loss in the form of the decreased value of their Class Vehicles, even when the Burl Walnut Wood Trim fading, discoloration, and clouded appearance has not yet manifested.

141.   Because of Mercedes' unfair, deceptive, and/or fraudulent business practices, and its failure to disclose the Burl Walnut Wood Trim and the problems associated therewith, owners and lessees of the Class Vehicles have suffered losses in money and/or property.

142.   Plaintiff and the other Class members were injured as a result of Mercedes' conduct in that Plaintiff and the other Class members overpaid for their Class Vehicles and did not receive the benefit of their bargain, and their Class Vehicles have suffered a diminution in value, whether the trim in them are repaired or replaced or not. These injuries are the direct and natural consequence of Mercedes' misrepresentations and omissions.

## **FRAUDULENT CONCEALMENT FACTS DETAILED**

143.    Absent discovery, Plaintiff is unaware of, and unable through reasonable investigation to obtain, the true names and identities of those individuals at Mercedes responsible for disseminating false and misleading marketing materials and information regarding the Class Vehicles. Mercedes necessarily is in possession of, or has access to, all this information.  Plaintiff is, however, able to provide sufficient specificity on the concealment, as set forth herein.

144.    Defendants owed a duty to Plaintiff and the putative Class members to disclose to them what was known about the Burl Walnut Wood Trim as soon as they were known.  Defendants knew that Plaintiff and the putative Class members chose the Mercedes brand and, specifically, the Burl Walnut Wood Trim, intentionally and for the purpose of displaying their luxury vehicles in with this attractive and signature Mercedes interior (when it is not defective).  Because of the particular nature of Plaintiff and the putative Class members who affirmatively chose the Mercedes brand and the Burl Walnut Wood Trim, Defendants were on notice that the Plaintiff and the putative Class members expected certain qualities from the Burl Walnut Wood Trim.

145.    Plaintiff's claims arise out of Mercedes' fraudulent concealment of the interior trim defect and the fading, discoloration, and clouding of the Class Vehicles' Burl Walnut Wood Trim it causes, and its representations about the quality,

durability, and value of the Class Vehicles, including the trim used in the Class Vehicles.

146. To the extent that Plaintiff's claims arise from Mercedes' fraudulent concealment, there is no one document or communication, and no one interaction, upon which the Plaintiff and putative Class members base their claims. Plaintiff alleges that at all relevant times, including specifically at the time they purchased their Class Vehicles, Mercedes knew, or was reckless in not knowing, of the trim defect; Mercedes was under a duty to disclose the trim defect based upon its exclusive knowledge of it, its affirmative representations about it, and its concealment of it, and Mercedes never disclosed the trim defect to Plaintiff or the public at any time or place or in any manner.

147. Plaintiff makes the following specific fraud allegations with as much specificity as possible although they do not have access to information necessarily available only to Mercedes:

  a. ***Who***: Mercedes actively concealed the Burl Walnut Wood Trim defect from Plaintiff and the putative Class members while simultaneously touting the quality and durability of the Class Vehicles, as alleged, *supra*. Plaintiff is unaware of, and therefore unable to identify, the true names and identities of those specific individuals at Mercedes responsible for such

decisions but upon information and belief understand them to be employees within the sales and marketing division of Defendants.

b.    *What*: Mercedes knew, or was reckless or negligent in not knowing, that the Class Vehicles contain the Burl Walnut Wood Trim defect, as alleged, *supra*. Mercedes concealed the Burl Walnut Wood Trim defect and made contrary representations about the quality and durability, and other attributes of the Class Vehicles, as alleged, *supra*. Defendants in fact actively instructed dealers to take steps to hide the Burl Walnut Wood Trim defect if it was not already expressing itself through the fading, discoloration, and cloudiness that inevitably develops in the Burl Walnut Wood Trim, as alleged, *supra.*

c.    *When*: Mercedes concealed material information regarding the Burl Walnut Wood Trim defect at all times and made representations about the quality and durability of the Class Vehicles, starting no later than 2010, or at the subsequent introduction of certain years models of Class Vehicles to the market, continuing through the time of sale/lease, and on an ongoing basis, and continuing to this day, as alleged, *supra*. Mercedes has not disclosed the truth about the trim defect in the Class Vehicles to anyone outside of Mercedes. Mercedes has never taken any action to inform consumers about

the true nature of the trim defect in Class Vehicles. And when consumers brought their Class Vehicles to Mercedes complaining of the fading, discoloration, and clouding of the Burl Walnut Wood Trim in their Class Vehicles, Mercedes denied any knowledge of, or responsibility for, the Burl Walnut Wood Trim defect, and in many instances, actually blamed owners/lessees for causing the problem. A prime example of this deception and concealment is when Defendants instructed dealers to take measures to hide the defect in the First TSB, as alleged, *supra,* in as far back as November of 2010 (and likely earlier in the first version of the First TSB, which Plaintiff has been unable to locate).

d. ***Where***: Mercedes concealed material information regarding the true nature of the Burl Walnut Wood Trim defect in every communication it had with Plaintiff and the putative Class members and made contrary representations about the quality and durability of the Class Vehicles. Plaintiff is aware of no document, communication, or other place or thing in which Mercedes disclosed the truth about the Burl Walnut Wood Trim defect in the Class Vehicles to anyone outside of Mercedes. Such information is not disclosed, never mind adequately disclosed, in any sales documents, displays, advertisements, warranties, owner's manual, or on Mercedes' website—

despite the fact that it knew of the defect and knew how to instruct dealers on how to hide the defect by moving stickers and coverings from the Burl Walnut Wood Trim such that the fading, discoloration, and cloudiness of the Burl Walnut Wood Trim is not apparent to customers when they purchase the Class Vehicle.

e.    ***How***: Mercedes concealed the Burl Walnut Wood Trim defect from Plaintiff and the putative Class members and made representations about the quality and durability of the Class Vehicles. Mercedes actively concealed the truth about the existence and nature of the Burl Walnut Wood Trim defect from Plaintiff and the putative Class members at all times, even though it knew about the Burl Walnut Wood Trim defect and knew that information about the Burl Walnut Wood Trim defect would be important to a reasonable consumer, and Mercedes promised in its marketing materials that the Class Vehicles have qualities that they do not have. Prime evidence of Defendants knowledge that the Burl Walnut Wood Trim defect would be important to decision making is the fact that it instructed dealers to replace Burl Walnut Wood Trim that was expressing the defect and to take efforts to prevent the defect from being apparent in those Class Vehicles that were not yet

expressing the fading, discoloration, and cloudy appearance that would inevitably develop in the Burl Walnut Wood Trim.

f.     ***Why***: Mercedes actively concealed material information about the Burl Walnut Wood Trim defect in Class Vehicles for the purpose of inducing Plaintiff and the putative Class members to purchase or lease Class Vehicles, rather than purchasing or leasing competitors' vehicles and made representations about the quality and durability of the Class Vehicles. Had Mercedes disclosed the truth, for example in its advertisements or other materials or communications, Plaintiff (and reasonable consumers) would have been aware of it and would not have bought the Class Vehicles or would have paid less for them.

148.   Had Defendants disclosed the Burl Walnut Wood Trim defects to Plaintiff and the putative Class members, they would not have been damaged, as alleged *supra*, as they would not have purchased or leased their Class Vehicles.  Each Plaintiff and the putative Class members, because of the nature of the Class Vehicles as luxury and special vehicles, would have been in a position, whether via advertising, marketing, research or otherwise to have learned of Defendants' disclosures concerning the Burl Walnut Wood Trim defects.

149.   Further, had Defendants disclosed the Burl Walnut Wood Trim defects, the asking price or sticker price of the Class Vehicles would have been considerably less than other Mercedes cars of similar vintage and mileage but with differing interior trims, thereby putting Plaintiff and the putative Class members in a position to learn of the Burl Walnut Wood Trim defect prior to purchase or lease. The Class Vehicles would also have been more effectively and consistently compared to competitors' cars, thereby putting Plaintiff and the putative Class members in a position to learn of the Burl Walnut Wood Trim defect prior to purchase or lease.

## CLASS ACTION ALLEGATIONS

150.   Plaintiff brings this action on behalf of herself and other similarly situated as a class action pursuant to Federal Rule of Civil Procedure 23. The Classes which Plaintiff seeks to represent are composed of and defined as (collectively "Class"):

a.    A class of all consumer residents in the United States who own, owned, lease, or leased a Class Vehicle.

b.    By Callen, a subclass of all consumer residents in South Carolina who own, owned, lease, or leased a Class Vehicle.

c.    By Callen, a subclass of all consumer residents in North Carolina who own, owned, lease, or leased a Class Vehicle.

151.    The following persons are excluded from the definition of the Class:

a.    U.S. District Court judges, magistrate judges of any U.S. District Court, judges of the U.S. Court of Appeals for the Eleventh Circuit, and U.S. District Court personnel having any involvement with administration and/or adjudication of this lawsuit;

b.    Class counsel and their employees; and

c.    Employees of Defendants.

152.    This action has been brought and may properly be maintained as a Class action pursuant to the provisions of the Federal Rules of Civil Procedure, for these reasons:

a.    Members of the Class are geographically distributed throughout the United States and exceed 1,000 in total so that their joinder is impractical; and

b.    Common questions of law or fact exist as to all members of the Class and predominate over any questions affecting only individual Class members.

c.    Plaintiff's claims are typical of the claims of the members of the Class under Federal Rule of Civil Procedure 23. Each member of the Class either owns, owned, leases, or leased a Class Vehicle.

d.    Plaintiff will fairly and adequately protect the interest of the Class as required by Federal Rule of Civil Procedure 23. Plaintiff has no interests which are adverse to the interest of the Class. They have retained counsel who has substantial experience in the prosecution of Class actions.

e.    The prosecution of separate actions by individual members of the Class would create the risk of (i) inconsistent or varying adjudications with respect to individual members of the Class which would establish incompatible standards of conduct for Defendants; or (ii) adjudications with respect to individual members of the Class which would as a practical matter be dispositive of the interest of the other members not parties to the adjudication or substantially impair or impede their ability to protect their interest.

f.    Pursuant to Federal Rule of Civil Procedure 23(b)(2), Defendants has acted or refused to act on grounds generally applicable to Plaintiff and Class, causing injury to them and making Class-wide relief appropriate, specifically declaratory and injunctive relief.

g.    The questions of law or fact common to the Class predominate over questions affecting only individual members. A Class action is superior to all other available methods for the fair and efficient adjudication of this

controversy under Federal Rule of Civil Procedure 23. The harm suffered by many individual members of the Class may not be great enough to warrant the expense and burden of individual litigation, which would make it difficult or impossible for individual members of the Class to redress the wrongs done to them. Individualized litigation would also present the potential for inconsistent or contradictory judgments and would magnify the delay and expense to all parties and the court system in multiple trials of the complex factual issues of the case. By contrast, the conduct of this action as a Class action presents far fewer management difficulties, conserves the resources of the parties and the court system, and protects the rights of each Class member.

## COUNT ONE
### (Breach of Express Warranty)
### (for all Class(es))

153.   Plaintiff, individually and for the Class, hereby incorporate each and every allegation as though fully set forth herein.

154.   For each Class Vehicle, an express written warranty was issued that covered the vehicle, including but not limited to the interior trim, and which warranted the vehicle to be free of defects in materials and workmanship at the time of delivery.

155.    Defendants breached their warranties by offering for sale and selling vehicles with defective trim and whose application was defective, thereby subjecting the occupants of the Class Vehicles purchased or leased to damages and risks of loss and injury.

156.    Defendants further issued an express written warranty to the original owner, and each subsequent owner, that an authorized Mercedes-Benz dealer would make any repairs or replacements necessary to correct defects in material or workmanship arising during the warranty period, without cost.

157.    Defendants breach its warranties by refusing to repair or replace the Class Vehicles for latent defects which arose during the warranty period or refusing to do so without charge to the owners.

158.    Plaintiff gave notice to Defendants as required under any express written warranty, and Defendants were further on direct and constructive notice of the Burl Walnut Wood Trim defect separate and apart from the notice provided by Plaintiff.    Authorized Mercedes dealerships, such as the ones that Plaintiff and putative Class members communicated with, wrote to, and who ultimately denied warranty coverage for the trim defect, were authorized agents of Defendants. Indeed, at all relevant times, Defendants' authorized dealerships were their agents for motor vehicle repairs and warranty issues because they performed repairs,

replacements, and adjustments covered by Defendants' manufacturer warranties, and the relevant warranties specifically authorize any such Mercedes-Benz authorized dealer (or center) to act on their behalf.

159. Defendants knew that their Class Vehicles would be sold and/or distributed by its authorized dealers, which is the only method by which new or CPO Class Vehicles could be sold or leased, and they knew their Class Vehicles would be re-sold by Defendants' authorized dealers and third-party dealers. All such sales, whether new, CPO, or used, were intended to be distributed by dealers and were intended to be bought by immediate and secondary purchasers in the marketplace, and the claimed violations occurred in direct and immediate connection with the consumer transactions that give rise to this claim. Additionally, as noted above, *supra*, Defendants exercised direct control over the materials, engineering, manufacturing, and design of the interior systems of the Class Vehicles. Defendants' breach of its express warranties proximately caused the Class to suffer damages in excess of $5,000,000.00.

160. Defendants breached their warranty by failing to remedy the defect or otherwise adequately replace, repair the defective Burl Walnut Wood Trim interior in the warranty period despite them having obligations to do so under that warranty.

161.   Plaintiff and the Class seek full compensatory damages allowable by law, attorneys' fees, costs, punitive damages, and appropriate equitable relief including injunctive relief, a declaratory judgment, a court order enjoining Defendants' wrongful acts and practices, restitution, the repair of all Class vehicles, replacement of all Class Vehicles, the refund of money paid to own or lease all Class Vehicles, and any other relief to which Plaintiff and the Class may be entitled.

**COUNT TWO**
**(Breach of Implied Warranty)**
**(for all Class(es))**

162.   Plaintiff, individually and for the Class, hereby incorporate each and every allegation as though fully set forth herein.

163.   Defendants impliedly warranted that the Class Vehicles, which they engineered, manufactured, developed, designed, sold, or leased to Plaintiff and Class members, were merchantable, fit for their ordinary use, not otherwise injurious to consumers, and would come with adequate warnings.  However, the Class Vehicles were neither merchantable, fit for their ordinary use, nor non-injurious to Plaintiff and Class members at the time of the sale of the Class Vehicles to them.

164.   Persons who purchased a Class Vehicle are entitled to the benefit of their bargain: a vehicle without defective Burl Walnut Wood Trim that fades, discolors, and becomes cloudy.

165.   Because the Class Vehicles are equipped with the defective Burl Walnut Wood Trim, the vehicle purchased or leased and used by Plaintiff and Class members is unfit for use when sold, threatens injury to its occupants, and is not merchantable. Defendants breached the implied warranty of merchantability in the sale or lease of the Class Vehicles to Plaintiff and members of the Class in that the vehicles were not fit for their ordinary purpose and not merchantable, and affected the drivability, safety, and usefulness of the Class Vehicles.

166.   Had the fact that the Burl Walnut Wood Trim defect existed been disclosed at the time of sale, the Class Vehicles could not have been sold, or could not have been sold at the same price.

167.   Defendants knew that their Class Vehicles would be sold and/or distributed by its authorized dealers, which is the only method by which new or CPO Class Vehicles could be sold or leased, and they knew their Class Vehicles would be re-sold by Defendants' authorized dealers and third-party dealers.  All such sales, whether new, CPO, or used, were intended to be distributed by dealers and were intended to be bought by immediate and secondary purchasers in the marketplace, and the claimed violations occurred in direct and immediate connection with the consumer transactions that give rise to this claim.  Additionally, as noted above,

*supra*, Defendants exercised direct control over the materials, engineering, manufacturing, and design of the interior systems of the Class Vehicles.

168.   Plaintiff and Class members are in privity with Defendants for at least the reason that they are direct beneficiaries and intended third party beneficiaries as shown by at least the fact that any warranty travels with subsequent purchasers when within the warranty period and at all relevant times, Defendants' authorized dealerships were their agents for motor vehicle repairs and warranty issues because they performed repairs, replacements, and adjustments covered by Defendants warranties, and the relevant warranties specifically authorize any such Mercedes-Benz authorized dealer (or center) to act on their behalf.  Defendants' breach of its express warranties proximately caused the Class to suffer damages in excess of $5,000,000.00.

169.   Plaintiff and the Class seek full compensatory damages allowable by law, attorneys' fees, costs, punitive damages, and appropriate equitable relief including injunctive relief, a declaratory judgment, a court order enjoining Defendants' wrongful acts and practices, restitution, the repair of all Class vehicles, replacement of all Class Vehicles, the refund of money paid to own or lease all Class Vehicles, and any other relief to which Plaintiff and the Class may be entitled.

## COUNT THREE
### (Equitable and Injunctive Relief)

**(for all Class(es))**

170.   Plaintiff, individually and for the Class, hereby incorporate each and every allegation as though fully set forth herein.

171.   Plaintiff, members of the Class, and the public will suffer irreparable harm if Defendants are not ordered to properly repair all of the Class Vehicles immediately, offer rescission to the Class by repurchasing their Class Vehicles for their full cost, reimburse the lessees of the Class Vehicles the monies they have paid toward their leases, recall all defective vehicles that are equipped with the defective Burl Walnut Wood Trim, and cease and desist from marketing, advertising, selling, and leasing the Class Vehicles with the latent defect.

172.   Defendants are under a continuing duty to inform its customers of the nature and existence of potential defects in the vehicles sold.

173.   Such irreparable harm includes but is not limited to likely injuries as a result of the defects to the Class Vehicles.

174.   Plaintiff and Class members are likely to be harmed by MBUSA's alleged conduct in the future because a large majority of Mercedes vehicles come equipped with Burl Walnut trim, Plaintiff and, upon information and belief, many Class members are repeat customers of Mercedes, and the E-class Mercedes is the most widely sold model of Mercedes' vehicle lineup.

175.   Plaintiff and the Class seek full compensatory damages allowable by law, attorneys' fees, costs, punitive damages, and appropriate equitable relief including injunctive relief, a declaratory judgment, a court order enjoining Defendants' wrongful acts and practices, restitution, the repair of all Class vehicles, replacement of all Class Vehicles, the refund of money paid to own or lease all Class Vehicles, and any other relief to which Plaintiff and the Class may be entitled.

## COUNT FOUR
## (Violation of the Magnuson-Moss Warranty Act, 15 U.S.C. §§ 2301, et seq.)
## (for all Class(es))

176.   Plaintiff, individually and for the Class, hereby incorporate each and every allegation as though fully set forth herein.

177.   For each Class Vehicle, Defendants issued an express written warranty that covered the vehicle, including but not limited to the interior surfaces, and which warranted the vehicle to be free of defects in materials and workmanship at the time of delivery.

178.   Defendants breached its express warranties by offering for sale and selling defective vehicles that contained Burl Walnut Wood Trim that was defective and whose application was defective, thereby subjecting the occupants of the Class Vehicles purchased or leased to damages and risks of loss and injury.

179.   Plaintiff and members of the Classes are "consumers" within the meaning of the Magnuson-Moss Act, 15 U.S.C. § 2301(3).

180.   Defendants are a "supplier" and "warrantor" within the meaning of the Magnuson-Moss Act, 15 U.S.C. § 2301(4) and (5).

181.   The Class Vehicles are "consumer products" within the meaning of the Magnuson-Moss Act, 15 U.S.C. § 2301(6).

182.   Defendants' written and implied warranties relate to the future performance of its vehicles because it promised that the Class Vehicles would perform adequately for a specified period of time or mileage, whichever came first.

183.   Defendants have breached and continues to breach its written and implied warranties of future performance, thereby damaging Plaintiff and Class members, when their Class Vehicles fail to perform as represented due to an undisclosed Burl Walnut Wood Trim defect. Defendants fail to fully cover or pay for necessary inspections, repairs, replacements and/or vehicle replacements for Plaintiff and the Class.

184.   Plaintiff, members of the Class, and the public will suffer irreparable harm if Defendants are not ordered to properly repair all of the Class Vehicles immediately, offer rescission to the Class by repurchasing their Class Vehicles for their full cost, reimburse the lessees of the Class Vehicles the monies they have paid

toward their leases, recall all defective vehicles that are equipped with the defective Burl Walnut Wood Trim, and cease and desist from marketing, advertising, selling, and leasing the Class Vehicles with the latent defect.

185.   Defendants are under a continuing duty to inform its customers of the nature and existence of potential defects in the vehicles sold.

186.   Such irreparable harm includes but is not limited to likely injuries as a result of the defects to the Class Vehicles.

187.   Plaintiff and the Class seek full compensatory damages allowable by law, attorneys' fees, costs, punitive damages, and appropriate equitable relief including injunctive relief, a declaratory judgment, a court order enjoining Defendants' wrongful acts and practices, restitution, the repair of all Class vehicles, replacement of all Class Vehicles, the refund of money paid to own or lease all Class Vehicles, and any other relief to which Callen and the Class may be entitled. That relief is in excess of $5,000,000.00.

## COUNT FIVE
### (Unjust Enrichment)
### (for all Class(es))

188.   Plaintiff, individually and for the Class, hereby incorporate each and every allegation as though fully set forth herein.

189.   To the extent necessary, Plaintiff brings this claim in the alternative.

190.    Defendants knew or should have known that Plaintiff and the Class paid for the Class Vehicles with the expectation that they would perform as represented.

191.    Plaintiff and the Class conferred substantial benefits on Defendants by purchasing the defective Class Vehicles.    Defendants knowingly and willingly accepted and enjoyed those benefits.

192.    Defendants exercised direct control over the materials, engineering, manufacturing, production, and design of the interior systems, including the defective Burl Walnut Woot Trim, of the Class Vehicles and Plaintiff and putative Class members had a direct link with Defendants.

193.    Defendants' retention of those benefits is inequitable.

194.    As a direct and proximate cause of Defendants' unjust enrichment, Plaintiff and the Class are entitled to an accounting, restitution, attorneys' fees, costs and interest. That relief is in excess of $5,000,000.00.

## **COUNT SIX**
### **(Fraud and Suppression Claim)**
### **(for South Carolina and North Carolina Subclasses)**

195.    Callen, individually and for the South Carolina and North Carolina Subclasses, hereby incorporate each and every allegation as though fully set forth herein.

196. Callen and the South Carolina and North Carolina Subclasses purchased or leased the Class Vehicles.

197. Defendants' concealed and suppressed material facts concerning the quality of the Class Vehicles.

198. Defendants concealed and suppressed material facts concerning the quality of the interior trim used on the Class Vehicles.

199. Defendants concealed and suppressed material facts concerning the Burl Walnut Wood Trim defect causing Class Vehicles' trim to fade, discolor, and become cloudy. Defendants knew that Plaintiff and Subclasses members would not be able to inspect or otherwise detect the latent defect prior to purchasing or leasing the vehicles.

200. At all relevant times, Defendants had the duty and obligation to disclose to the Plaintiff and Subclasses the defects with the Burl Walnut Wood Trim in the Class Vehicles. Defendants breached that duty by failing to disclose the issue with the defective trim and continuing to sell vehicles with the Burl Walnut Wood Trim, despite knowledge of the issues.

201. Defendants committed the foregoing acts and omissions in order to boost confidence in its vehicles and falsely assure purchasers and lessees of Mercedes vehicles, that the Class Vehicles were world class, comfortable, warranted

and reliable vehicles and concealed the information in order to prevent harm to Defendants and its products' reputations in the marketplace and to prevent consumers from learning of the defective nature of the Class Vehicles prior to their purchase or lease. These false representations and omissions were material to consumers, both because they concerned the quality of the Class Vehicles and because the representations and omissions played a significant role in the decision to purchase or lease the Class Vehicles.

202.  Defendant represented that they would repair, replace, or fix any problem in materials and workmanship, as noted above, *supra*, and Defendants failed to deliver on that promise and knew they would not deliver on that promise.

203.  Defendants had a duty to disclose the Burl Walnut Wood Trim defect in the Class Vehicles because it was known and/or accessible only to Mercedes; Mercedes had superior knowledge and access to the facts; and Mercedes knew the facts were not known to, or reasonably discoverable, by the Plaintiff and Subclasses. Defendants also had a duty to disclose because it made many general affirmative representations about the quality, warranty, and lack of defects in the Class Vehicles as set forth above, which were misleading, deceptive, and/or incomplete without the disclosure of the additional facts set forth above regarding their actual quality.

204.   Defendants had a special trusted relationship with Plaintiff and putative Class members on the specific facts of this case, evidenced at least by it summoning of "goodwill" credits to repair/replace some of the defective Burl Walnut Wood Trim interiors (though insufficiently so, as identified above, *supra*) for with its new purchasers and CPO customers.   Moreover, the fact that Mercedes had the exclusive knowledge of the defect and its latent nature, and took measures to instruct its dealers to make specific efforts to conceal the defect by removing stickers and coverings such that any fading, discoloration, or cloudiness was not apparent to the Plaintiff and putative Subclasses members gives rise to a special relationship, which unfortunately appears to have been tainted from the start, and knowingly made that way by Defendants' affirmative actions.

205.   As a result, the Plaintiff and Subclasses were misled as to the true condition of the Class Vehicles at purchase/lease.  The omitted and concealed facts were material because they directly impact the value, appeal, and usability of the Class Vehicles purchased or leased by the Plaintiff and Subclasses. Whether a manufacturer's products are as stated or backed by the manufacturer are material concerns to a consumer.

206.   Defendants actively concealed and/or suppressed these material facts, in whole or in part, to protect its reputation, sustain its marketing strategy, avoid

recalls that would hurt the brand's image and cost money, and did so at the expense of the Plaintiff and Subclasses.

207.   Had the Plaintiff and Subclasses known the truth, specifically that the Burl Walnut Wood Trim was not durable and long-lasting and, to the contrary, was defective, they would not have purchased or leased their vehicles, or they would have paid far less to buy or lease them.

208.   Because of the concealment and/or suppression of the facts, the Plaintiff and Subclasses suffered pecuniary injuries, including, but not limited to, loss of value, inconvenience, and repair costs.  Defendants' fraudulent concealment of the defect was the proximate cause of those losses.

209.   Additionally, Defendants omitted, suppressed, or concealed material facts of the defect of the Burl Walnut Wood Trim used on the Class Vehicles, leading to the same result: first, had the Plaintiff and Subclasses been informed of the truth, specifically that the trim was not durable and long-lasting and, to the contrary, was defective, they would not have purchased or leased their vehicles, or they would have paid far less to buy or lease them; and second, the Plaintiff and Subclasses suffered pecuniary injuries proximately caused by Defendants' suppression of the material facts of the defect, and those injuries include, but are not limited to, loss of value, inconvenience, and repair costs. Those injuries exceed $5,000,000.00.

## COUNT SEVEN
**(Violation of South Carolina's Unfair Trade Practices Act)**
**(For South Carolina Subclass)**

210.    Callen, ("Plaintiff," for purposes of all South Carolina Subclass counts) individually and for the South Carolina Subclass, hereby incorporates each and every allegation as though fully set forth herein.

211.    Callen, individually and for the South Carolina Subclass, brings this claim.

212.    Callen and the South Carolina Subclass members are "persons" within the meaning of South Carolina Code of Laws ("SCCL") §39-5-10(a); §39-5-140.

213.    Defendants are engaged in "trade" or "commerce" within the meaning of SCCL §39-5-10(b).

214.    The South Carolina Unfair Trade Practices Act ("SCUTPA") makes unlawful "[u]nfair methods of competition and unfair or deceptive acts or practices in the conduct of any trade or commerce." SCCL §39-5-20.

215.    Defendants have known of the true characteristics of their Burl Walnut Wood Trim since at least 2009 but concealed all of that information, and even to this day continues to conceal it.

216.    Defendants willfully and knowingly violated SCUTPA by knowingly misrepresenting and intentionally concealing material facts regarding the quality of

the Class Vehicles and the quality and benefits of the Burl Walnut Wood Trim interior used on the Class Vehicles. Defendants participated in misleading, false, and/or deceptive acts that violated the SCUTPA.  Specifically, in marketing, offering for sale/lease, and selling/leasing the defective Class Vehicles, Defendants engaged in one or more of the following unfair or deceptive acts or practices prohibited by SCCL §39-5-20:

a.  representing that the Class Vehicles have characteristics or benefits that they do not have;

b.  representing that the Class Vehicles are of a particular standard and quality when they are not;

c.  advertising the Class Vehicles with the intent not to sell them as advertised;

d.  engaging in other conduct which created a likelihood of confusion or of misunderstanding;

e.  using or employing deception, fraud, false pretense, false promise or misrepresentation, or the concealment, suppression, or omission of a material fact with intent that others rely upon such concealment, suppression, or omission, in connection with the advertisement and sale or lease of the Class Vehicles; and/or

f. other deceptions, concealments, frauds, false pretenses, false promises, and misrepresentation outlined in the Complaint that are unfair methods of competition and constitute unfair or deceptive acts.

217. Defendants knew that their Class Vehicles would be sold and/or distributed by its authorized dealers, which is the only method by which new or CPO Class Vehicles could be sold or leased, and they knew their Class Vehicles would be re-sold by Defendants' authorized dealers and third-party dealers. All such sales, whether new, CPO, or used, were intended to be distributed by dealers and were intended to be bought by immediate and secondary purchasers in the marketplace, and the claimed violations occurred in direct and immediate connection with the consumer transactions that give rise to this claim. Additionally, as noted above, *supra*, Defendants exercised direct control over the materials, engineering, manufacturing, production, and design of the interior systems, including the defective Burl Walnut Woot Trim, of the Class Vehicles and Plaintiff and putative Class members had a direct link with Defendants.

218. Defendants' scheme and concealment of the true characteristics of the Class Vehicles were material to Plaintiff and the South Carolina Subclass, and Defendants misrepresented, concealed, or failed to disclose the truth with the intention that Plaintiff and the South Carolina Subclass would rely on the

misrepresentations, concealments, and omissions.   Defendants new of the defective Burl Walnut Wood Trim issue prior to Callen's purchase of the Class Vehicle.

219.   Had they known the truth, Plaintiff and the South Carolina Subclass would not have purchased or leased the Class Vehicles or would have paid significantly less for them.

220.   Plaintiff and the South Carolina Subclass had no way of discerning that Defendants' representations were false and misleading, or otherwise learning the facts that Defendants had concealed or failed to disclose.

221.   Defendants had an ongoing duty to Plaintiff and the South Carolina Subclass to refrain from unfair and deceptive practices under SCUTPA in the course of their business.

222.   Defendants owed Plaintiff and the South Carolina Subclass a duty to disclose all the material facts concerning the Class Vehicles because they possessed exclusive knowledge, they intentionally concealed such material facts from Plaintiff and the South Carolina Subclass, and/or they made misrepresentations that were rendered misleading because they were contradicted by withheld facts.

223.   Plaintiff's and the South Carolina Subclass' injuries, losses, and damages were the direct and proximate cause of Defendants misrepresentations,

concealment, and failure to disclose the defective nature of the Burl Walnut Wood Trim.

224.    Plaintiff and the South Carolina Subclass suffered ascertainable losses and actual damages as a direct and proximate result of Defendants' concealment, misrepresentations, and/or failure to disclose material information. Those injuries exceed $5,000,000.00.  Additionally, Plaintiff and the South Carolina Subclass seek any and all damages and remedies provided by the SCUPTA, including, without limitation, attorneys' fees, costs, treble/punitive damages, and appropriate equitable relief including injunctive relief, a declaratory judgment, revocation of Defendants' license or certificate authorizing them to engage in business in South Carolina, a court order enjoining Defendants' wrongful acts and practices, restitution, the repair of all Class vehicles, replacement of all Class Vehicles, the refund of money paid to own or lease all Class Vehicles, and any other relief to which Plaintiff and the Class may be entitled.

## COUNT EIGHT
**Violation of the North Carolina Unfair and Deceptive Trade Practices Act**
**(On behalf of the North Carolina Subclass)**

225.    Callen ("Plaintiff," for purposes of all North Carolina Subclass counts), individually and for the North Carolina Subclass, hereby incorporates each and every allegation as though fully set forth herein.

226.    Callen, individually and for the North Carolina Subclass, brings this claim.

227.    North Carolina's Unfair and Deceptive Trade Practices Act, N.C. Gen. Stat. §§ 75-1.1, et seq. ("NCUDTPA"), prohibits a person from engaging in "[u]nfair methods of competition in or affecting commerce, and unfair or deceptive acts or practices in or affecting commerce[.]" The NCUDTPA provides a private right of action for any person injured "by reason of any act or thing done by any other person, firm or corporation in violation of" the NCUDTPA. N.C. Gen. Stat. § 75-16.

228.    Defendants' acts and practices complained of herein were performed in the course of Defendants' trade or business and thus occurred in or affected "commerce," as defined in N.C. Gen. Stat. § 75-1.1(b) and were engaged in during Defendants' marketing, sale and/or distribution of the Class Vehicles

229.    The Plaintiff and North Carolina Subclass purchased the Class Vehicles for personal, family, or household use.

230.    Defendants have known of the true characteristics of their Burl Walnut Wood Trim since at least 2009 but concealed all of that information, and even to this day continues to conceal it.

231.    Defendants were also aware that they valued profits over truthfulness and lawfulness, and that they were manufacturing, selling and distributing vehicles

throughout the United States that contained a known trim defect. Defendants concealed this information as well.

232.   By failing to disclose and by actively concealing the trim defect and, by marketing its vehicles as of high quality, and by presenting itself as a reputable manufacturer that stood behind their vehicles after they were sold, Defendants engaged in deceptive and unconscionable business practices in violation of the NCUDTPA.

233.   In the course of Defendants' business, they willfully failed to disclose and actively concealed the trim defect discussed above.  Defendants compounded the deception by repeatedly asserting that the Class Vehicles had paint of high quality and by claiming to be a reputable manufacturer that stood behind their vehicles and warranties once they are on the road.

234.   Defendants' unfair or deceptive acts or practices were likely to and did in fact deceive reasonable consumers, including Plaintiff and the North Carolina Subclass, about the true nature of the trim defect, the quality of the Mercedes brand, the integrity and lawfulness at Mercedes, the representations in their warranties, and the true value of the Class Vehicles.

235.   Defendants' acts and practices as described herein have misled and deceived and/or likely to mislead and deceived the Plaintiff and the Subclass and the

general public of the State of North Carolina. Defendants have advertised, marketed, and sold the Class Vehicles as set forth herein. Thus, Defendants have wrongfully:

a.    represented that the Class Vehicles have sponsorship, approval, characteristics, ingredients, uses benefits or qualities that they do not have;

b.    represented that the Class Vehicles are of a particular standard, quality, or grade, or that they are of a particular style or model, when they are of another;

c.    knowingly, intentionally, and/or recklessly omitted, suppressed, and/ or concealed the true nature of the Class Vehicles;

d.    engaged in unconscionable, false, misleading, and/or deceptive acts and/or practices in the conduct of trade or commerce – marketing, advertising, and selling the Class Vehicles.

e.    advertised the Class Vehicles with intent not to sell them as advertised.

236.  By their actions, Defendants disseminated and are disseminating uniform false advertising which by its nature is unfair, deceptive, untrue, and/or misleading within the meaning of the NCUDTPA. Such actions are likely to deceive, do deceive, and continue to deceive the North Carolina general public for all the reasons detailed herein above.

237.  Defendants intended for the Plaintiff and North Carolina Subclass to rely on their representations and omissions and the Plaintiff and North Carolina Subclass did rely on Defendants' misrepresentations and omissions of fact.

238.   Defendants' conduct proximately caused injuries to Plaintiff and the North Carolina Subclass. By performing the acts described herein, Defendants caused monetary damage to the Plaintiff and North Carolina Subclass of similarly situated individuals.   Defendants furthermore acted with willful and conscious disregard of the rights and safety of others, subjecting Plaintiff and the North Carolina Subclass to cruel and unjust hardship as a result, such that an award of punitive damages is appropriate.

239.   For the reasons set forth in detail above, the Defendants engaged in unfair and deceptive acts and practices, which acts and practices were "immoral, unethical, oppressive, unscrupulous, or substantially injurious to consumers," in or affecting commerce, which directly and proximately caused significant injury to the Plaintiff and the Subclass, contrary to North Carolina's Unfair and Deceptive Trade Practices Act, N.C. Gen. Stat. § 75-1.1, et seq.

240.   Accordingly, Plaintiff request the following relief both individually and on behalf of the North Carolina Subclass:

      a.    actual damages sustained by the Plaintiff and North Carolina Subclass or the sum of $100.00, whichever is greater;

      b.    treble actual damages;

      c.    appropriate injunctive relief in the form of enjoining Defendants from continuing to violate North Carolina statutory law;

d.      attorneys' fees and costs; and

e.      such other and further relief as the Court deems proper.

## **PRAYER FOR RELIEF**

WHEREFORE, Plaintiff, on behalf of herself and all others similarly situated, request an order and judgment against Defendants which –

1.      Certifies the Class and appoints Plaintiff and their counsel to represent the Class.

2.      Grants declaratory judgment to Plaintiff and Class.

3.      Enjoins Defendants from doing the wrongs alleged.

4.      Grants compensatory relief to Plaintiff and Class in the utmost amount allowed by law.

5.      Awards punitive damages against the Defendants in favor of Plaintiff and Class in the utmost amount allowed by law.

6.      Awards a reasonable attorneys' fees to Plaintiff and Class, as prescribed by law and for the common and public good obtained in this action.

7.      Grants such other, further and different relief as the nature of the case may require or as may be determined to be just, equitable, and proper by this Court.

## DEMAND FOR JURY TRIAL

Plaintiff and the Class hereby demand a trial by struck jury on all issues.

Dated this 28th day of March 2019.

Respectfully submitted,

*/s/ James F. McDonough, III.*
JAMES F. MCDONOUGH, III.
GA Bar No: 117088
jmcdonough@hgdlawfirm.com
HENINGER GARRISON DAVIS, LLC
Jonathan R. Miller (GA Bar No: 507179)
jmiller@hgdlawfirm.com
Travis E. Lynch (GA Bar No:162373)
tlynch@hgdlawfirm.com
3621 Vinings Slope, Suite 4320
Atlanta, GA 30339
Tel: 404-996-0869, 0863, 0867
Fax: 205-326-5502, 5506, 5515


W. Lewis Garrison, Jr.
GA Bar No.: 286815
lewis@hgdlawfirm.com
Taylor C. Bartlett
GA Bar No.: 778655
taylor@hgdlawfirm.com
HENINGER GARRISON DAVIS, LLC
2224 1st Avenue North
Birmingham, Alabama 35203
Telephone:   (205) 326-3336
Facsimile:    (205) 326-3332


*Attorneys for Plaintiff and putative Class*

93

## <u>LOCAL RULE 7.1 COMPLIANCE CERTIFICATE</u>

Pursuant to L.R. 7.1.D, this certifies that the foregoing document complies with the font and point selections approved by L.R. 5.1.C. The foregoing document was prepared using Times New Roman font in 14 point.

Dated: March 28, 2019.

*/s/ James F. McDonough, III.*
James F. McDonough, III (GA Bar #: 117088)
**Heninger Garrison Davis, LLC**
3621 Vinings Slope, Suite 4320
Atlanta, Georgia 30339
P: (404) 996-0860
F: (205) 380-8076
jmcdonough@hgdlawfirm.com